Ben CUTLER et al., Plaintiffs,

v.

AMERICAN FEDERATION OF MUSICIANS OF the UNITED STATES AND CANADA and Associated Musicians of Greater New York Local 802, Defendants.

United States District Court
S. D. New York.
Nov. 2, 1962.

Godfrey P. Schmidt, New York City, for plaintiffs.

McGoldrick, Dannett, Horowitz & Golub, New York City, for defendant American Federation of Musicians of the United States and Canada, Emanuel Dannett, New York City, of counsel.

Ashe & Rifkin, New York City, for defendant Associated Musicians of Greater New York Local 802, David I. Ashe, New York City, of counsel.

LEVET, District Judge.

This action was originally begun on July 20, 1962 by the individual plaintiffs Ben Cutler, Dan Terry, Ralph Flanagan, Marty Levitt, Vic Ash, Claude Garreau (d/b/a Allen Meritt) and Angie Bond in their own behalf and as representatives of a class of all orchestra leaders who are either employers or self-employed persons. On October 16, 1962 a number of other parties were permitted to intervene as co-plaintiffs.

The complaint states a single cause of action for certain declaratory and injunctive relief alleging that the defendants are violating Section 302(a), (b) and (c) of the Labor-Management Relations Act, as amended, 29 U.S.C. § 186, by requiring certain payments by "employers" to the defendant unions.

Specifically, this action seeks:

(1) A declaratory judgment of illegality respecting (a) a certain so-called "local tax" of 1½% heretofore imposed and collected from plaintiff and other orchestra leaders and self-employed musicians who are members of Local 802, and (b) a so-called "traveling surcharge" of 10% imposed and collected by the defendant Federation for all musical engagements outside the home local of the sidemen or self-employed musicians involved; both alleged to be in violation of Section 302 of the Labor-Management Relations Act of 1947, as amended.

(2) Temporary and permanent injunctions (a) forbidding defendants, their officers, agents, servants, employees and attorneys and all persons in active concert or participation with them (who receive actual notice of such injunction order by personal service or otherwise) from imposing or collecting or from attempting in any way to impose or collect the said "local tax" and the said 10% "traveling surcharge"; and (b) visiting upon plaintiffs, because of this action or because of plaintiffs' refusal to pay the said "local tax" or the said 10% "traveling surcharge", penalties and reprisals.

The present action is part of a controversy between the defendant unions and certain orchestra leaders. It has precipitated four actions in this court in addition to the present one (viz., 60 Civil 1169, 2939, 4025 and 4926). The five actions involve two basic charges against the defendant unions. First, that the defendant unions have violated Section 302 of the Labor-Management Relations Act, as amended, 29 U.S.C. § 186, and, second, that the defendant unions have conspired together with other orchestra leaders to violate the federal anti-trust laws.

Two of the actions (60 Civil 1169 and 60 Civil 4025) were brought by Joseph Carroll, Charles Peterson and Orchestra Leaders of Greater New York (hereinafter "OLGNY") on their own behalf and for an alleged class for violation of Section 302 (hereinafter the "Carroll actions). These actions were tried before me on March 5 to 9, 1962.

The Carroll actions dealt, as does this action, with the legality of the local tax and the traveling surcharge which are required to be paid to the unions under their By-Laws. In an Opinion, Findings of Fact and Conclusions of Law dated June 25, 1962, I dismissed the complaints on the ground that Carroll and Peterson, being no longer members of the union, did not have standing to secure the relief sought.

In this case, the plaintiffs moved for a preliminary injunction on July 20, 1962, by order to show cause. On September 27, 1962, I rendered an Opinion with Findings of Fact and Conclusions of Law directing the entrance of a preliminary injunction against the defendants inuring to all of the then plaintiffs. An order to this effect was signed on October 16, 1962.

Thereafter and by stipulation dated October 24, 1962 and confirmed by order dated October 25, 1962, the attorney for the plaintiffs in this action and the attorneys for the two above-mentioned defendants agreed that, upon the pleadings in this case; the transcript of the testimony and the exhibits in the trial in Carroll et al. v. Associated Musicians of Greater New York et al., 60 Civil 1169, and in Carroll et al. v. Associated Musicians of

Greater New York et al., 60 Civil 4025, D.C., 206 F.Supp. 462, which took place on March 5 through 9, 1962; the affidavits and exhibits submitted by the plaintiffs in support of their motion for preliminary injunction dated July 20, 1962, the affidavits and exhibits submitted by the defendants in opposition thereto; and upon all other proceedings heretofore had herein, this court shall make findings of fact and conclusions of law and shall direct the entry of appropriate judgment but solely with respect to (a) the cause of action asserted by the plaintiff Ben Cutler, and (b) the class action alleged in the complaint herein.

Based on the record as stipulated, I make the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

#### I. THE PARTIES

1. Plaintiff Ben Cutler at all times relevant herein was and now is an orchestra leader engaged in the so-called "single engagement" field and at the commencement of this action was and now is a member of defendants American Federation of Musicians of the United States and Canada ("Federation") and Associated Musicians of Greater New York Local 802 ("Local 802").

2. Defendant Federation is a labor union or labor organization within the meaning of the Labor-Management Reporting and Disclosure Act of 1959. It is affiliated with the AFL–CIO and its principal office and place of business is at 425 Park Avenue, New York, N. Y. It is an international union comprising 683 local unions, including defendant Local 802, and is located throughout the United States and Canada. (Ballard, 665, 667)[1]

3. Defendant Local 802 is a labor organization within the meaning of the Labor-Management Reporting and Disclosure Act of 1959 and is affiliated with the defendant Federation. Its principal office and place of business is located at 261 West 52 Street, New York, 19, N. Y. Local 802 represents, among others, members who are leaders and sidemen [2] in the single engagement field. Under Federation By-Laws, the territorial jurisdiction of Local 802 consists of the five boroughs of New York City and the Counties of Nassau and Suffolk. (Pl. Ex. 12, Section 6, p. 5; Cutler, 80–81; Arons, 453) [3]

4. Membership in a local affiliated with Federation implies membership in the Federation. (Pl. Ex. 29, Sections 10 and 11, p. 34; Arons, 430).

#### II. THE SINGLE ENGAGEMENT INDUSTRY

5. A single engagement is defined in the By-Laws of defendant Local 802 (Pl. Ex. 29, Art. X, p. 63) and is a musical performance generally for one night but always for less than one week, including, but not limited to, such types of functions as weddings, commencements, debutante parties, fashion shows, sports events, college or high school dances or other social events. (Cutler, 69, 242–243; Arons, 438, 457; Pl. Ex. 53, p. 39)

6. In the single engagement field, defendant Local 802, as a matter of policy, does not bargain collectively with member orchestra leaders. (Pl. Ex. 53, pp. 45, 68; Pl. Ex. 56, p. 110; see also Jaffe, 581–582)

1. All references are to the testimony and exhibits in the trial of Carroll actions, 60 Civil 1169 and 60 Civil 4025, except as otherwise noted.

2. The term "sidemen" refers to musicians who perform in a band or orchestra but does not include the leader or conductor of said band or orchestra.

3. The defendant in paragraphs 14–17 of the answer denies that the Constitution and By-Laws of both the Federation and Local 802, which were annexed to the complaint in this action as Exhibits A and B, are the most recent. An examination of the most recent Constitution and By-Laws of both defendants which were introduced in the Carroll actions 60 Civil 1169 and 60 Civil 4025 shows that they contain provisions identical to those contained in the Exhibits A and B annexed to the complaint. No allegation is made that the provisions in the most recent Constitution and By-Laws differ from those of the earlier ones.

7. Travel by orchestras in the single engagement field composed of members of defendant unions is contemplated by defendant unions and regulated by them in various ways. Thus, among others, Section 2 of Article 17 of the By-Laws of the Federation (Pl. Ex. 11, p. 114) provides:

"If the Local Union in whose jurisdiction an engagement is to be played has a Local law requiring its members to file a written contract with the Local prior to each engagement, the traveling member of the traveling leader must so file such contract with such Local Union."

Section 13 of Article 15 (Pl. Ex. 11, p. 104) provides:

"An orchestra playing miscellaneous out-of-town engagements [i.e., single engagements involving travel] in the jurisdiction of a Local which maintains a higher price than their own Local, must charge the price of the Local in whose jurisdiction they are playing, plus 10% of the price of the Local wherein playing."

Section 14 of Article 16 (Pl. Ex. 11, p. 109) provides:

"For all traveling engagements the employer is required to at all times make payment for services in money of the country from which the engagement emanates, unless an amount in excess of the stipulated salary sufficient to cover the rate of exchange is paid."

Similarly, Rule 4 of defendant Local 802's Price List (Pl. Ex. 7, p. 23) in pertinent part provides:

"Rule 4. For all single engagements beyond the limits of Greater New York (except engagements on Long Island covered below) or the jurisdiction of Jersey City Local, No. 526, in addition to railroad fare, board and lodging, the following extra charges shall be made:

"If within 25 miles, per man.$3.00
"If within 50 miles, per man. 5.00
"If within 75 miles, per man. 7.00

"For each additional 25 miles
  or less, extra, per man.... 2.00"

In short, defendants' own publications and practices, such as their 10% traveling surcharge, their rules and regulations pertaining to traveling members, their mileage charges, their regulations pertaining to steamship performances, etc., demonstrate that defendant unions represent members (both leaders and sidemen) in the single engagement field whose engagements require a constant continuous stream of trade and commerce between the States of the United States. (Pl. Ex. 7, 11, Arts. 15, 16, 26, 27; Deft. Exs. AE, AL, AQ, AR, AR1)

8. Cutler fulfills engagements outside the State of New York, in which he usually operates and in which his principal office is located. (See Cutler 154–155, 185)

9. Defendant unions require their members to use a form of contract known as the "Form B Contract," which contract designates the purchaser of music as the "employer" and the musicians, including the leader, as "employees." (Pl. Ex. 13; Ballard, 695–696, 698; Cutler, 136; Arons, 471) The Form B Contract or, at least, the details of such contract must be filed with Local 802 by member orchestra leaders performing within the jurisdiction of Local 802 and such contracts are not deemed effective unless approved by Local 802. (Pl. Ex. 53, p. 55; Pl. Ex. 56, pp. 127–128; Arons, 455–456) Any member failing to use said Form B Contract is subject to penalty by the Federation. (Pl. Ex. 11, Art. 13, § 33; Ballard, 697–699)

10. The purchaser of music is not in fact the employer of the sidemen and of the leader and, consequently, the purchaser is sometimes unwilling to assume the responsibility of an employer. (Cutler, 170ff; Ballard, 722–724). Accordingly, the Form B Contract as prescribed by defendant unions has in the past been subject to exception by rider which exonerates the purchaser who signs it from certain responsibilities as an employer, such as the withholding of taxes and the

making of customary employer contributions, such as social security. (Pl. Exs. 25 p. 7, 79, 93 pp. 12–13)

11. Plaintiff Cutler devotes his full time to his profession as leader. He never serves as sideman and his relationship with his clients or customers, who are normally engaged in other businesses or professions than his, is transient in nature.

12. In the course of his business, plaintiff Cutler, among other things, customarily does the following:

(a) Organizes his own bands (Cutler, 72);

(b) Maintains his own offices where he employs steady and/or part-time employees (Cutler 77–78);

(c) Acquires business as a result of his own contacts, reputation, and personal solicitations (Cutler, 78–79);

(d) Engages in and pays for advertising (Cutler, 80–85, 87, 127–128, 261–262; Peterson, 360) and prominently displays his name wherever his engagements are played, thus indicating that the orchestra is the Ben Cutler Orchestra (Cutler, 116, 260, 347);

(e) Negotiates and signs engagement contracts with purchasers of music (Cutler, 91);

(f) Generally leads or conducts his own orchestra (Cutler, 77) and appoints subleaders to lead when he does not do so himself (Cutler, 73);

(g) Decides on how his orchestras are to render their pieces; chooses the tempo and decides on the dynamics, tone coloring, volume and the type of syncopation, if any, which is to characterize the performance of his orchestras (Cutler, 117–118);

(h) Decides, subject to union minimum requirements, on the number (Cutler, 91, 95) and qualifications of sidemen who are to play in his orchestras (Cutler, 72, 91);

(i) Calls for rehearsals and trains his orchestras if he deems it necessary (Cutler, 129, 130); and

(j) Corrects sidemen during a performance if necessary and otherwise disciplines or discharges those who are unsatisfactory (Cutler, 121–122).

13. There is no evidence that purchasers of music contributed, or had the ability to contribute, musical skill or direction which would give them genuine or effective control over the individual methods employed by Cutler and his orchestras in rendering performances.

14. Cutler pays all expenses connected with the performance of his orchestras, including, among other things, subject to union minimums, sidemen's salaries (Cutler, 91–92); uniforms, if any, worn by his sidemen during engagements (Cutler, 111); mileage fees, cartage fees, food and lodging for his orchestras (Cutler, 111–115); sheet music racks; and special arrangements of music to be played by his orchestras. (Cutler, 119, 129–130)

15. Cutler, in connection with the employment of his sidemen, withholds and pays over to the appropriate governmental agencies federal and state withholding taxes and social security. In addition, he pays workmen's compensation and disability insurance on behalf of his sidemen. These items are paid because, under the particular governmental regulations involved, orchestra leaders are regarded as "employers." (Cutler, 125–126, 138)

III. TRAVELING SURCHARGE

16. Art. 15 of the By-Laws of the Federation provides a definition of "Miscellaneous Out-of-Town Engagements," which corresponds in duration with Local 802's definition of "single engagements" (see Finding of Fact No. 5). (Compare Pl. Ex. 11, Art. 15, §§ 1 and 2, with Pl. Ex. 29, Art. X, p. 63)

17. Federation members who perform a "miscellaneous out-of-town engagement" are paid, but do not actually receive, in addition to their wages, an amount equal to 10% of the minimum wage established by the local in whose jurisdiction the engagement takes place. This additional amount is known as the "traveling surcharge." (Pl. Ex. 11, Art. 15; Art. 16, § 1A; Art. 17 § 1)

18. The leader does not actually turn over the additional 10% to his sidemen because Federation By-Laws provide that the local in whose jurisdiction such engagement is performed must collect the traveling surcharge from the leader, who is a member of the Federation, and transmit such collection to the Federation. (Pl. Ex. 11, Art. 15, § 7) If the local fails to collect the surcharge from the leader, who is a member of the Federation, such leader must transmit the surcharge directly to the Federation. (Pl. Ex. 11, Art. 15, § 8)

19. The provisions of Federation's By-Laws relating to the traveling surcharge are applicable without regard to whether the member of the Federation who pays, collects or transmits the traveling surcharge may for some purposes be deemed to be an employer or an employee. (Pl. Ex. 11, Art. 15, §§ 1–3)

20. Defendants never obtain from any of the member sidemen involved any writing authorizing deduction of any part of the 10% traveling surcharge from their wages. (Pl. Ex. 53, pp. 67–68; Cutler, 153, 208; Arons, 443, 515, 529; statements of counsel, 760–762)

21. Defendant Federation retains ⁴/₁₀ths of the traveling surcharge. The remaining ⁶/₁₀ths is distributed as follows:

³/₁₀ths is returned to the leader who initially transmitted it for the purpose of his undertaking the distribution and return of this amount to the individual members of the Federation, i. e., the sidemen, who played the particular engagement; and

³/₁₀ths is returned to the local in whose jurisdiction the engagement was played. (Pl. Ex. 11, Art. 15, § 7; see also Deft. Exs. V, p. 345; AF; AG)

22. Members of the Federation, including member orchestra leaders, are subject to disciplinary action by the Federation for violation of the provisions of the By-Laws, including the provisions concerning the traveling surcharge. (Pl. Ex. 11, Art. 7, § 6; Art. 15, § 15; see also Jaffe, 650)

## IV. LOCAL 802 TAX

23. Defendant Local 802 imposes a "Local Tax," as defined or authorized in its By-Laws (pp. 65–66) and in Article 16, Section 26, of the By-Laws of the Federation, as well as in certain standing resolutions having the force and effect of By-Laws of Local 802. (Pl. Exs. 12, pp. 64–66; 29, pp. 65–66; Arons, 440–441, 446)

The Membership Resolutions contained in said By-Laws of Local 802 provide that the Local Tax is to be "payable and collected from all members * * * on all engagements based on the scale price therefor" (Pl. Exs. 12, p. 65; 29, p. 65) and the orchestra leader as a member of Local 802 is responsible for collecting and transmitting the Local Tax. (Pl. Ex. 12, p. 66; Arons, 442–443, 446, 512–514; Jaffe, 622–624)

24. Defendants never used, or obtained from the member sidemen involved, any writing authorizing deduction of Local Taxes from the wages of the sidemen. (Cutler, 153, 208; Arons, 443, 514–515, 529; stipulation of counsel, 760, 762)

25. The Local 802 tax is imposed solely on members of Local 802 and no person not a member of Local 802 is under any obligation to pay, collect, or transmit the tax to Local 802. The membership obligation which requires members of the Local 802 to pay, collect or transmit said Local Tax is unrelated to a member's status as an employer or an employee. (Pl. Ex. 12, pp. 65–67)

26. Members of Local 802 are subject to disciplinary action for violation of the provisions of the By-Laws of Local 802, including the provisions relating to the 1½% Local 802 tax. (Pl. Ex. 12, Art. IV, § 1(kk) p. 41)

27. A temporary restraining order was signed in this case on July 20, 1962 by Judge Thomas F. Croake of this court. Subsequently, Joseph Carroll and Charles Peterson sent four letters on the stationery of OLGNY interpreting the meaning of this order. Carroll and Peterson are not parties to this action.

The first letter, dated July 26, 1962, was addressed to all locals of the American Federation of Musicians. The letter stated:

"ATTENTION ALL LOCALS OF THE AMERICAN FEDERATION OF MUSICIANS

"On Friday, July 20, 1962, U. S. District Judge Thomas F. Croake, issued an order restraining the AMERICAN FEDERATION OF MUSICIANS and all its LOCALS from collecting the 10% 'surcharge' on traveling engagements and also restraining LOCAL 802 from collecting its 1½% Local Tax. This restraining order covers *steady* engagements as well as single, miscellaneous, or one-nighters. *THERE ARE NO ESCROW PROVISIONS IN THIS ORDER.*

"We hereby notify you that you are restrained by Judge Croake's temporary restraining order from enforcing Article 15 of the American Federation of Musicians Constitution and By-Laws. Violation of that order by you will subject the Federation and its agents (including its Locals and Local Officials) to liability for contempt of court.

\* \* \* \* \*

"In our recent case against the FEDERATION and LOCAL 802, after a 5 day trial, U. S. Judge Levet on June 25, 1962, made the following Finding:

"\* \* \* 'Consequently, Section 186 [of Section 302 of the Taft-Hartley Act, as amended] applies to these payments [for the 10% 'traveling surcharge', the 1½% 'Local tax' and the Welfare Plan 'surcharge'] and since they do not comply with the exceptions contained in Section 186(C), they are unlawful.' \* \* \*

"Anyone found violating this law is subject to $10,000 fine or imprisonment for not more than one year or both."

The second letter, dated July 30, 1962, was addressed to orchestra leaders. It stated:

"Fellow Orchestra Leader:

"On July 20, 1962 we obtained a United States court order restraining the A.F.M. and all its locals from visiting upon orchestra-leader employers any economic or other reprisals upon the basis of their failure to pay the 10% traveling surcharge imposed by the A.F.M. and its locals and the 'Local Tax' of 1½% imposed by Local 802. It also prevents the union from bringing charges or other union penalties against the leader for failure to pay the 10% tax as well as the Local 802 tax.

"The reason for bringing this to your attention is because several leaders who play the mountains asked us what they should do in event they are told by the union that they must pay this tax. We, therefore pass on to you the advice we have given them:

"'DO NOT PAY THIS TAX, AND IF THE UNION THREATENS YOU WITH CHARGES OR BRING REPRISALS IN ANY WAY, PUT THIS DOWN IN WRITING AND THIS, TOGETHER WITH ANYTHING IN WRITING FROM THE UNION, MAIL IT IMMEDIATELY TO OUR ATTORNEY, GODFREY P. SCHMIDT AT 60 EAST 42nd STREET, NEW YORK 17, N. Y. HE WILL THEN PROCEED IN FEDERAL COURT TO HOLD THE LOCAL INVOLVED AND THE FEDERATION IN CONTEMPT OF COURT FOR VIOLATING A FEDERAL COURT ORDER AND FOR THREATENING YOUR LIVELIHOOD'.

"We just received a letter from an orchestra leader who plays in the mountains and we are attaching a copy of this letter for your reading. You will note that Marty gives us authorization to act in his behalf. If you wish the same protection as

Marty is getting and also wish to stop this ridiculous tax, sign the authorization slip that is attached and send it immediately to our attorney. If you require additional slips for other leaders, please let us know."

The third letter, dated August 9, 1962, was also addressed to orchestra leaders. This letter stated in part:

"Fellow Orchestra Leaders:

"By way of keeping you up to date on the status of the litigation against the Musicians union and particularly against the 10% tax, we are enclosing a reprint from today's Variety which will show you that Stan Kenton, Ralph Marterie and Georgie Auld have joined with Ralph Flanagan and a host of other orchestra leaders in our legal battle against the practice of this 10% tax and other discriminatory practices of the American Federation of Musicians and its Locals.

"The mere signing of the authorization slips by these leaders entitle them, under U. S. Court order to immediately cease paying the 10% tax on any of their single and steady engagements. *They have stopped paying and the union can do nothing about it.*"

In the fourth letter, dated August 16, 1962, also addressed to orchestra leaders, Mr. Carroll stated in part:

"UNDER THIS NEW U. S. COURT ORDER THE UNION CANNOT BRING REPRISALS OR CHARGES AGAINST ANYONE WHO REFUSES TO PAY THESE UNLAWFUL EXACTIONS."

28. There is no evidence whatsoever to connect the plaintiff Cutler in any way with these letters. The evidence proves that the letters were authored by Charles Peterson and signed by Joseph Carroll. (Transcript of hearing, September 19, 1962, pp. 78–89) Carroll did not ask nor receive any advice or aid of counsel in preparing these letters. (Id. at 83, 84–85)

29. Upon the record before me I find that plaintiff has no adequate remedy at law and will suffer irreparable harm if this injunction is not granted. Unless defendants are restrained from imposing, exacting or collecting the local tax and 10% surcharge, plaintiff will suffer irreparable harm by way of the aforesaid exactions, by way of interference with his business, and by way of economic and other reprisals, including loss of business and unavailability of sidemen. Also, irreparable harm will result due to the fact that defendants are mandated by their own constitutions and by-laws to visit penalties and reprisals upon any member (as well as an expelled member) who fails to pay the traveling surcharge and local tax. (Constitution, Federation, Art. 15, §§ 8–12)

30. The plaintiff purports to bring this action for himself and for a class of all orchestra leaders.[4] I find, however, that there is a lack of sufficient credible evidence at this time that such a class exists, and, even if found to exist, that its

---

4. The complaint in 62 Civil 2552 provides in Paragraph 38:

"38. Plaintiffs bring this action for themselves and for all orchestra leaders who (a) are members of defendants, or are ex-members, expelled because of failure or refusal to pay the unlawful 'local tax' or 'traveling surcharge' aforesaid; and (b) are employers or self-employed persons; and (c) are published in 'Allegro' under the heading 'Memberships Terminated for Nonpayment of . . .' the said 'taxes' or 'surcharge' or under any similar heading, or are threatened with or are liable to such or other publication if they fail or refuse to pay the said 'local tax' or 'traveling surcharge.' Such members are so numerous as to make it impractical to bring them all before this Court. This complaint raises issues of rights common to all such members; all such members are similarly situated; a common relief for all such persons is sought, the object of this action is the adjudication of claims which do or may seriously affect specific property rights of plaintiffs and of all such persons; plaintiffs fairly represent the members of said class; and this class action authorized by Rule 23 of the Federal Rules of Civil Procedure."

members are "so numerous as to make it impractical to bring them all before this court."

31. There is no evidence to support the defense of laches.

## DISCUSSION

### A. JURISDICTION

The single engagement industry, as has previously been determined, consists of interstate commerce. As Judge Friendly wrote in Carroll v. American Fed. of Musicians, 2 Cir., 1961, 295 F.2d 484, concerning the local tax and the traveling surcharge, at page 487:

"* * * The Local's by-law imposing the 'tax' and the provision of the International's Constitution imposing the 'traveling surcharge' are not limited to engagements within the state; indeed, the latter applies only to engagements outside the Local's own jurisdiction, many, if not most, of which would be outside the state of New York. The case with respect to interstate commerce is thus immeasurably stronger than that before Judge Dimock; and if we were preliminarily satisfied of an effect on commerce there, we must surely be so here. We hold that defendants have thus far failed to raise any substantial issue that these two impositions did not relate to 'an industry affecting commerce,' United States v. Shubert, 1955, 348 U.S. 222, 75 S.Ct. 277, 99 L.Ed. 279."

See also Carroll v. Associated Musicians of Greater New York, D.C.S.D.N.Y.1960, 183 F.Supp. 636, aff'd 2 Cir., 1960, 284 F.2d 91.

■ Title 29 U.S.C. § 402(c) defines "industry affecting commerce" as "any activity, business, or industry in commerce or in which a labor dispute would hinder or obstruct commerce or the free flow of commerce and includes any activity or industry 'affecting commerce' within the meaning of the Labor-Management Relations Act, 1947, as amended, or the Railway Labor Act, as amended." The Labor-Management Relations Act of 1947, 29 U.S.C. § 142(1) defines the phrase as "any industry or activity in commerce or in which a labor dispute would burden or obstruct commerce of the free flow of commerce." The term "commerce" is defined in 29 U.S.C. § 152(6) as "trade, traffic, commerce, transportation, or communication among the several States * * *." The amount of interstate business done by employer is not controlling with regard to the power of Congress to regulate such business and Congress has the power to regulate even intrastate business where such business tends to burden or affect interstate commerce. National Labor Relations Board v. Fainblatt, 1939, 306 U.S. 601, 59 S.Ct. 668, 8 L.Ed. 1014; Consolidated Edison Co. of New York v. National Labor Relations Board, 1938, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126; Polish Nat. Alliance of United States v. National Labor Relations Board, 1944, 322 U.S. 643, 64 S.Ct. 1196, 88 L.Ed. 1509.

■ The single engagement industry is "an industry affecting commerce" (see Findings of Fact Nos. 7 and 8) and the fact that the rendering of a musical performance is a "local affair" is not determinative. The plaintiff in connection with his business customarily does many more things in addition to the actual leading of his orchestras, such as the negotiating and signing of engagement contracts and the transporting of sidemen, musical instruments and other required materials between states of the United States. (See Finding of Fact No. 12) As Mr. Justice Warren stated in United States v. International Boxing Club, 1955, 348 U.S. 236, 241, 75 S.Ct. 259, 99 L.Ed. 290, decided the same day as the Shubert case, supra:

"A boxing match—like the showing of a motion picture (United States v. Crescent Amusement Co., 323 U.S. 173, 183 [65 S.Ct. 254, 259, 89 L.Ed. 160]) or the performance of a vaudeville act (Hart v. B. F. Keith Vaudeville Exchange, 262 U.S. 271 [43 S.Ct. 540, 67 L.Ed. 977]) or the performance of a legitimate stage attraction (United States v. Shu-

bert, ante, [348 U.S.] p. 222, 75 S. Ct. 277, 99 L.Ed. 279)—'is of course a local affair.' But that fact alone does not bar application of the Sherman Act to a business based on the promotion of such matches, if the business is itself engaged in interstate commerce or if the business imposes illegal restraints on interstate commerce."

■ Defendants also challenge the jurisdiction of this court on the grounds that the Norris-LaGuardia Act, 29 U.S. C. § 101 et seq., prohibits the granting of the injunctive relief sought. The challenge is without merit.

The statute on which this suit is based is 29 U.S.C. § 186. Subsection (e) of that section specifically provides that the district courts of the United States shall have jurisdiction " * * * to restrain violations of this section [29 U.S.C. § 186], without regard to the provisions of * * * sections 101–110 and 113–115 of this title [Norris-La Guardia Act, 29 U.S.C. § 101 et seq.]." See Sinclair Refining Co. v. Atkinson, 1962, 370 U.S. 195, 205, 82 S.Ct. 1328, 8 L.Ed.2d 440.

**B. THE CLASS ACTION**

Rule 23(a) of the Federal Rules of Civil Procedure in pertinent part provides:

"If persons constituting a class are so numerous as to make it impracticable to bring them all before the court, such of them, one or more, as will fairly insure the adequate representation of all may, on behalf of all, sue or be sued, when the character of the right sought to be enforced for or against the class is

\* \* \* \* \* \*

"(3) several, and there is a common question of law or fact affecting the several rights and a common relief is sought."

■■ Rule 23(a) (3) provides for the spurious class action. See generally 3 Moore's Federal Practice, pp. 3442–3455. The rule requires that the character of the right sought to be enforced for or against the class be "several," that there be a "common question of law or fact" affecting the several rights, and that "common relief is sought." Mutation Mink Breeders Association v. Lou Nierenberg Corp., D.C.S.D.N.Y.1959, 23 F.R. D. 155. As Judge Bryan stated in the Mutation Mink case:

"The 'spurious class suit' is merely a device for permissive joinder. California Apparel Creators v. Wieder of California, supra [2 Cir., 162 F.2d 893]; 3 Moore, Federal Practice, 3442. It does not 'grant authority to adjudicate finally rights as to nonappearing parties or to confer any additional substantive rights upon the plaintiffs suing'. California Apparel Creators v. Wieder of California, supra, 162 F.2d at page 897; Oppenheimer v. F. J. Young & Co., 2 Cir., 144 F.2d 387; Nagler v. Admiral Corp., 2 Cir., 248 F.2d 319. It is an invitation to the members of the affected class to join in the action. If they do not so join they cannot be bound by the result. 3 Moore, Federal Practice, 3443; Weeks v. Bareco Oil Co., 7 Cir., 125 F.2d 84; Nagler v. Admiral Corp., supra."

In effect, it is but a congeries of separate suits. See also P. W. Husserl, Inc. v. Newman, D.C.S.D.N.Y.1960, 25 F.R.D. 264; Kaeppler v. James H. Matthews & Company, D.C.E.D.Pa.1960, 180 F.Supp. 691, 695.

Plaintiff has failed to prove an essential element required for class actions under Rule 23 of the Federal Rules of Civil Procedure. It appears that plaintiff attempts to define the class as one separate and distinct from the total membership of defendant Local 802. The plaintiff alleges that the class is composed of Local 802 orchestra leaders who, like plaintiff, never act as sidemen and devote all or substantially all of their time to their profession as orchestra leaders, (b) for their engagements employ sidemen who are members of defendant unions, and (c) deal with their clients as employers or independent contractors.

There is a lack of sufficient evidence to support the conclusion that such a class exists.

In 3 Moore's Federal Practice § 23.05 (2d Ed. 1948) it is stated:

"The *raison d'etre* of the class suit doctrine is necessity, which in turn depends upon the question of number. The question of what constitutes impracticability—when is a class so numerous as to make it impracticable to bring them all before the court—therefore remains.

"A reading of the cases convinces one that whether a number is so large that it would be impracticable to join all the parties is dependent not upon any arbitrary limit, but rather upon the circumstances surrounding the case; and there must be a positive showing of such circumstances. [citations omitted]"

Defendants have introduced in this action in support of the non-existence of the class 500 affidavits of members of the unions alleging that no special class of orchestra leaders exists and that the plaintiffs cannot adequately represent their interests. Additionally, these affidavits state that there are many members who do not appear to object and who, consequently, cannot be considered as members of the same class as plaintiff.

■ It is, of course, true that the entire membership of defendant unions may constitute a class on whose behalf a class action may be instituted to vindicate common rights. But, as the court observed with regard to a true class action in Giordano v. Radio Corporation of America, 3 Cir., 1950, 183 F.2d 558, 560, 561:

"Here the affidavits upon which the court acted make it perfectly clear that the membership of Local 103 is sharply divided on the very question involved in this case, the expulsion of the plaintiff and his associates. * * * With a class thus sharply divided in opinion it would be absurd to say that the leader of one faction in the internecine struggle could adequately represent the whole membership. * * *

"In a true class suit the plaintiffs stand in judgment for the class and a judgment for or against the plaintiffs benefits or binds each member of the class personally under the principles of res judicata. The members of the class must, therefore be capable of definite identification as being either in or out of it. Such identification would not be possible in a case, such as this, of fluid factional groups in a labor union.

"The suit must, therefore, be regarded as brought by the plaintiff either solely to redress his own personal grievances against the defendants or possibly to redress the grievances of all the sixteen individuals whose expulsion has been voted."

The court found that if the latter view was taken this was "a spurious class suit, rather than a true one * * *. [I]t could hardly be held that they [plaintiffs] constitute a class 'so numerous as to make it impracticable to bring them all before the court.' * * * [T]he suit, if it may be entertained at all, must be regarded as brought by the plaintiff for his own benefit solely." Similarly, in Gray v. Reuther, D.C.E.D.Mich.1951, 99 F. Supp. 992, aff'd 6 Cir., 201 F.2d 54, plaintiff brought a class action seeking his own reinstatement as an officer of a union local and damages. The court dismissed the complaint and, among other things, stated:

"Moreover, plaintiff was ousted from office after an election in which approximately two thousand union members voted. Whether or not the election was valid, it shows that a substantial body of the membership of the Local is opposed to the plaintiff's position. The strength of the faction antagonistic to the plaintiff is immaterial; its existence indicates that the identity of interest that would qualify plaintiff to represent the members of Local 12 is lacking. Giordano v. Radio Corpora-

tion of America, 3 Cir., 183 F.2d 558."

■ Accordingly, the claims here cannot lie as a proper class suit. This disposition, however, does not preclude treating this suit as one brought by plaintiffs (however numerous) in their individual capacities. Weeks v. Bareco Oil Co., 7 Cir., 1941, 125 F.2d 84; see also Barbot v. Frackman, D.C.S.D.N.Y.1961, 191 F.Supp. 171; Giordano v. Radio Corporation of America, 3 Cir., 1950, 183 F.2d 558.

## C. STANDING TO SUE

■ Section 186(e) grants the district court jurisdiction to restrain violations of that section as follows:

"The district courts of the United States * * * shall have jurisdiction for cause shown * * * to restrain violations of this section."

The plaintiff Cutler, being a member of both the Federation and Local 802 (Finding No. 1) has the requisite standing to maintain this action.

## D. ILLEGALITY OF TAXES

■ The illegality of the two taxes in issue turns upon the status of the plaintiff as an employer. For without this status he is not within the provisions of Section 302, Labor Management Relations Act, as amended, 29 U.S.C. § 186. It is there provided in pertinent part:

"(a) It shall be unlawful for any employer to pay or deliver, or to agree to pay or deliver, any money or other thing of value to any representative of any of his employees who are employed in an industry affecting commerce.

\* \* \* \* \* \*

"(c) The provisions of this section shall not be applicable * * * (4) with respect to money deducted from the wages of employees in payment of membership dues in a labor organization: *Provided,* That the employer has received from each employee, on whose account such deductions are made, a written assignment * * * or (5) with respect

to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents) : *Provided,* That * * * (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer, and employees and employers are equally represented in the administration of such fund, together with such neutral persons as the representatives of the employers and the representatives of the employees may agree upon * * *."

It is conceded that no written authorizations were ever executed by employees with respect to the 1½% local tax and the 10% traveling surcharge. (See Opinion, Findings of Fact and Conclusions of Law, June 25, 1962, filed in Carroll v. Associated Musicians of Greater N. Y., D.C., 206 F.Supp. 462)

Defendants, however, deny that plaintiff is an employer within the meaning of Section 186 and, consequently, assert that the statute is inapplicable to the payments involved herein. Judge Friendly answered the defendants in the following terms:

"Although defendants deny that the orchestra leader is the 'employer' of the sidemen and claim the father of the bride is the true employer, as indeed the contract form says, we think this contention, far from being serious or difficult, borders on the frivolous for reasons stated in another connection by the Court of Claims in Cutler v. United States, 1960, Ct.Cl., 180 F.Supp. 360, 362,—an opinion followed by Judge Dimock in his decision in Carroll v. Associated Musicians of Greater New York, supra, which we affirmed. * * *" 295 F.2d, supra at 486.

The contention of plaintiff that he is the employer of his sidemen in the single engagement field is clearly supported by the record before me. (Findings of Fact Nos. 10–15)

Consequently, Section 186 applies to these payments and since they do not comply with the exceptions contained in Section 186(c), they are unlawful.

However, in regards the steady engagement field,[5] there is a lack of sufficient evidence to establish that the plaintiff in this action acts as an employer. (Cutler, 69–71, 176–182, 216–18) Accordingly, the illegality of the tax is here limited to the single engagement field. This finding is without prejudice to the introduction at the trial by the remaining plaintiffs of evidence tending to establish the employer relationship.

## E. DEFENSE OF UNCLEAN HANDS

■ The defendants allege that the plaintiff is not entitled to any equitable relief because he has been guilty of "unclean hands" by having deliberately misrepresented the scope of the temporary restraining order issued by Judge Thomas F. Croake of this court on July 20, 1962 in this action.

The alleged deliberate misrepresentations took the form of four letters signed by Joseph Carroll on the stationery of OLGNY, in which he interpreted the meaning of the temporary restraining order dated July 20, 1962. (See Findings of Fact Nos. 27–28)

Since there is no evidence linking the plaintiff Cutler with these letters, even assuming that these letters constitute inequitable conduct, he is not barred from the relief requested.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the parties and of the subject matter of this action.

2. There is insufficient evidence in the record before me to establish a class as defined in the complaint, and even if found to exist, that its members are "so numerous as to make it impractical to bring them all before this court."

3. The plaintiff has standing to maintain this action.

4. The local tax and the traveling surcharge are illegal as applied to the plaintiff in the single engagement field.

5. Plaintiff is not guilty of "unclean hands."

6. Irreparable harm would result to the plaintiff from a denial of a permanent injunction in that the unlawful exactions would seriously and irreparably interfere with the conduct of his business.

7. The plaintiff is not barred by laches.

Therefore, the plaintiff is entitled to an injunction to provide as follows:

(1) That defendants, their officers, agents, servants, employees and attorneys and those persons in active concert with them who receive actual notice of this injunction order be and they hereby are permanently enjoined and restrained from demanding or from attempting to demand from plaintiff when acting as an employer in the single engagement field, as defined in Finding of Fact No. 5 of this opinion:

"(A) The one and one-half (1½%) per cent 'tax' authorized or defined by defendants in the Constitution (Article 16, Section 26) of defendant, American Federation of Musicians of the United States and Canada, and in the By-Laws (pp. 65 and 66) of defendant, Local 802, Associated Musicians of Greater New York, and in certain Standing Resolutions having the force and effect of By-Laws of Local 802,

"(B) The ten (10%) per cent 'traveling surcharge' defined and promulgated by defendants in Article 15 of the Federation's Constitution."

---

5. Under Local 802 rules, an engagement for a period of five or more days in any week or for three or four days per week for two or more consecutive weeks is a steady engagement. Any other engagement is a single engagement.

(2) That defendants, their officers, agents, servants, employees and attorneys and those persons in active concert with them who receive actual notice of the injunction order be and they hereby are permanently enjoined from:

"(a) interfering with the said plaintiff or his business,

"(b) inflicting upon plaintiff, directly or indirectly, any reprisals or penalties (except purely intra-union penalties, such as expulsion) because of failure or refusal upon the part of the plaintiff under the circumstances above mentioned to pay to defendant unions any of the aforesaid 'taxes' or 'traveling surcharges,'

"(c) threatening in any way, whether directly or indirectly, any musicians (sidemen), customers or prospective customers of said plaintiff because of the failure of plaintiff under the circumstances above mentioned to pay to defendant unions any of the aforesaid 'taxes' or 'traveling surcharges' or because of the termination of membership of said plaintiff where such termination results from failure to pay said 'tax' or 'traveling surcharge.'

"(d) preventing any musicians (sidemen) from working with or for the plaintiff herein because of the failure of plaintiff under the circumstances above mentioned to pay to defendant unions any of the aforesaid 'taxes' or 'traveling surcharges' or because of the termination of membership of said plaintiff where such termination results from failure to pay said 'tax' or 'traveling surcharge.' "

(3) The defendants, their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of this injunction, shall retract any and all threats, which have not already been retracted, to musicians or sidemen who are members of defendant unions and who work or who manifest a disposition to work for plaintiff, or to actual or prospective customers of plaintiff because of plaintiff's failure to pay the aforesaid "tax" or "traveling surcharge;" and defendants shall advise members of defendant unions that they are not required or expected to avoid or refuse employment with orchestra leaders who have failed to pay the aforesaid "taxes" or "traveling surcharges" or to pay the fines imposed by reason of such failure; and said retraction of threats and said advice to members may be made in the next available issues of "Allegro" and "International Musician" or by individually mailed notices; except that defendants need not address said retractions or advice to the plaintiff herein in view of the specific provisions hereof inuring to the benefit of plaintiff.

(4) That defendants shall forthwith cease publishing, and that defendants shall not publish (such as in "Allegro," "International Musician," etc.) the name of the plaintiff Cutler as having been expelled for either failure to pay the aforesaid "tax" or "traveling surcharge" or any fine imposed in connection with failure to pay said "tax" or "surcharge."

(5) That none of the provisions of this order shall run in favor of any alleged class represented by the above-named plaintiffs or the named intervening plaintiffs, but shall apply solely and only to the plaintiff Cutler. The preliminary injunction entered on October 16, 1962 shall, however, remain in force and effect as to the other co-plaintiffs.

I expressly direct the entrance of a final decree and judgment as to the plaintiff Cutler upon the express determination that there is no just reason for delay. The stipulation of October 24, 1962 in effect severed the plaintiff Cutler from the other co-plaintiffs and allowed for a separate trial as to him on a stipulated record. Fed.R.Civ.P. 42(b). All of the testimony as to Cutler has already been received and the case as to him is fully submitted. Neither his status as an employer nor his right to a permanent injunction will in any way be affected by the evidence received at the trial as to the status of the remaining plaintiffs.

The entrance of an immediate final decree and judgment solely as to this plaintiff will eliminate much unnecessary evidence, confine the issues, shorten the trial as to the remaining plaintiffs, save much expense to the litigants in connection with the trial and contribute considerably to expediting the work of the court. Fed. R.Civ.P. 54(b). Cf. Shippers Pre-Cooling Service v. Macks, 5 Cir., 181 F.2d 510, 514, cert. denied 340 U.S. 816, 71 S. Ct. 45, 95 L.Ed. 599 (1950); Combined Bronx Amusements v. Warner Bros. Pictures, D.C.S.D.N.Y.1955, 132 F.Supp. 921.

The foregoing constitutes my Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

Settle decree on notice.