**MAJOR LEAGUE BASEBALL, etc., et al., Plaintiffs,**

v.

**Robert A. BUTTERWORTH, etc., Defendant.**

**No. 4:01cv511–RH.**

United States District Court, N.D. Florida, Tallahassee Division.

Dec. 27, 2001.

---

Michael Eugene Kinney, John Phillips Cole, Foley & Lardner, Jacksonville, FL, Mary K. Braza, Milwaukee, WI, for Major League Baseball and Allan H. Selig.

Lori S. Rowe, Gray, Harris & Robinson, PA, Peter V. Antonacci, Gray, Harris & Robinson, Tallahassee, FL, for Tampa Bay Devil Rays, Ltd. and Florida Marlins Baseball Club LLC.

Patricia A. Conners, Attorney General, State of Florida, John D C Newton, II, Attorney General, State of Florida, Economic Crimes Etc. Div., Tallahassee, FL, for Robert A. Butterworth.

### MEMORANDUM OPINION

HINKLE, District Judge.

Major League Baseball has announced its intention to contract from 30 clubs to 28 for the 2002 season. The issue in this action is whether the federal and state antitrust laws apply to the proposed contraction. The defendant Attorney General of the State of Florida asserts that the antitrust laws do apply. Pursuant to his statutory authority to investigate possible violations of the federal and state antitrust laws, the Attorney General has issued civil investigative demands to plaintiffs Major League Baseball, its Commissioner, and the two Florida major league baseball clubs. Plaintiffs seek declaratory and injunctive relief against the Attorney General on the grounds that the "business of baseball," including the decision whether to contract, is exempt from the federal and state antitrust laws. Plaintiffs are correct.

By separate order, a preliminary injunction has been entered. This opinion sets forth the court's findings of fact and conclusions of law in support of the preliminary injunction and establishes a procedure for further consideration of this case.

## I

### Background

Baseball is an American game that has occupied a unique position in American society. Its history traces to the 19th century and has been described with some wistfulness in the normally pedestrian

pages of the United States Reports. *See Flood v. Kuhn,* 407 U.S. 258, 260–64, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972). But whatever its history, big league baseball is also big business. Some would say it faces big issues.

Major League Baseball is an unincorporated association of the 30 major league baseball clubs. It is governed by a Constitution adopted in January 2000. The Constitution authorizes contraction on the affirmative vote of three-fourths of the clubs.

On November 6, 2001, the clubs voted 28 to 2 in favor of contracting from 30 clubs to 28 for the 2002 season. The two Florida clubs voted in favor of contraction. On December 13, 2001, Major League Baseball announced that negotiations with the Players Association, an organization representing major league baseball players, had failed and that Major League Baseball was proceeding with the planned contraction. As this opinion is written, it appears that contraction is imminent.

On November 13, 2001, the Attorney General of the State of Florida issued sweeping civil investigative demands ("CIDs") to the plaintiffs in this action: Major League Baseball, Commissioner Allan H. Selig in his official and individual capacities, and the two Florida major league baseball clubs, the Tampa Bay Devil Rays, Ltd., and the Florida Marlins Baseball Club, L.L.C. Each CID said it was "issued pursuant to the Florida Antitrust Act of 1980, Section 542.28, Florida Statutes," identifying no other authority for its issuance. Each CID demanded that the recipient answer broad interrogatories and produce voluminous documents by December 13, 2001. The Attorney General refused to extend the deadline.

On December 10, 2001, plaintiffs filed this action, contending that, as a matter of federal law, the "business of baseball," a concept that plaintiffs assert includes the proposed contraction from 30 teams to 28, is exempt from the federal and state antitrust laws. Plaintiffs' complaint demanded declaratory and injunctive relief.

Plaintiffs filed motions for a temporary restraining order and preliminary injunction. On December 11, 2001, a hearing was held on plaintiffs' motion for a temporary restraining order. All parties were represented by counsel and presented argument. All parties agreed that the entire action appeared to present only issues of law. I denied the motion for temporary restraining order on the ground that plaintiffs would suffer no irreparable harm prior to a hearing on plaintiffs' motion for preliminary injunction. I scheduled the motion for preliminary injunction for hearing on December 18, 2001, a date approved by both sides, and announced my intention to consolidate the trial on the merits with the preliminary injunction hearing, as authorized by Federal Rule of Civil Procedure 65(a)(2). A written order confirmed the proposed consolidation and established a procedure for each side to give advance notice of its positions. Each side submitted a comprehensive trial brief in advance of the scheduled hearing.

On December 18, 2001, the preliminary injunction hearing and consolidated trial on the merits convened, with both sides announcing ready. Both sides presented testimony and exhibits, as well as argument. The Attorney General asserted during the testimony of plaintiffs' first witness that the Attorney General intended to seek discovery on issues being addressed by the witness (a very general summary of the effects contraction would have on such matters as scheduling) and thus intended to oppose full consolidation of the merits with the preliminary injunction hearing. At the conclusion of the hearing, I announced on the record my intention to enter a preliminary injunction, outlined the

reasons for that decision, and indicated that a written preliminary injunction and more comprehensive written explanation of the decision would be issued. I also announced that the Attorney General would be given the opportunity to review the written order and to address within a reasonable time thereafter whether he believed discovery and further proceedings should be commenced or instead agreed that the merits should be treated as consolidated with the preliminary injunction hearing in all respects and a final judgment entered. The Attorney General agreed to that procedure and agreed that plaintiffs should not be required to provide security as a condition of the preliminary injunction prior to the Attorney General's election whether to seek further proceedings in this court. A preliminary injunction was entered on December 21, 2001, in the expectation that this more comprehensive opinion would be issued.

These matters have been addressed with considerable dispatch because they are matters of some urgency and because, with commendable professionalism, both sides have cooperated in the prompt submission of the significant procedural and substantive issues presented by this case.

## II

### Jurisdiction

Plaintiffs assert that a state officer—the Attorney General of the State of Florida—has taken action, and has threatened further action, in violation of federal law. Plaintiffs seek relief under 42 U.S.C. § 1983 and the federal Declaratory Judg-

ment Act, 28 U.S.C. §§ 2201–02. The action arises under federal law and is within this court's jurisdiction under 28 U.S.C. § 1331.

Because plaintiffs seek only prospective relief and name as the defendant only a state officer, not the state in its own name, the Eleventh Amendment does not bar the action, under the doctrine of *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). *See Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) (holding that federal district court properly enjoined state attorney general from threatened enforcement of state regulations that were preempted by federal law). The Attorney General does not assert the contrary.[1]

## III

### Abstention

■ The Attorney General asserts I should abstain under the line of cases commencing with *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Those cases address the circumstances under which a federal court should decline to exercise its jurisdiction in deference to state criminal proceedings or certain state civil proceedings (ordinarily civil proceedings initiated by the state itself or by its officers or agencies). For two reasons, I exercise my discretion against abstention here.

■ First, no state criminal or civil proceeding is pending. Abstention ordinarily is not required when proceedings of sub-

---

1. The Attorney General does assert that, to the extent based on violations of state law, this action is barred by the Eleventh Amendment. This is correct. *See, e.g., Pennhurst State Sch. and Hosp. v. Halderman,* 465 U.S. 89, 121, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (holding that the Eleventh Amendment bars

any claim for injunctive relief based on state law against a state or against a state officer in his or her official capacity, even if otherwise within the court's pendent (now supplemental) jurisdiction). The preliminary injunction has been entered based on federal law only.

stance take place in federal court before any state criminal or civil proceeding is pending. *See, e.g., Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984) (upholding district court's refusal to abstain when state court proceedings did not begin until after proceedings of substance had taken place in district court). A necessary corollary of this rule is that abstention is not required when no state proceeding is pending at all. *See Red Bluff Drive–In, Inc. v. Vance,* 648 F.2d 1020, 1032 (5th Cir.1981) (holding lack of an ongoing state proceeding warranted the district court's refusal to abstain under *Younger* ).[2]

Second, the essential issue in this case on the merits is whether the Florida Attorney General's authority to investigate and enforce the antitrust laws has been preempted, with respect to the business of baseball, by federal law. The reasons for *Younger* abstention-deferring as a matter of comity to the state's efforts to enforce its own laws in a state forum in which any federal defense may be fully and fairly adjudicated-are substantially weakened when the issue is whether the state law at issue has been preempted by federal law, so that the state tribunal or officer at issue is acting beyond its jurisdiction.

This is illustrated by *Baggett v. Department of Professional Regulation,* 717 F.2d 521 (11th Cir.1983). In that case the State of Florida initiated disciplinary proceedings against a marine pilot. The pilot filed an action in federal court seeking to block the proceeding on the ground that state regulation of marine pilotage had been preempted by federal law. The district court abstained; unlike in the case at bar, there was a pending state proceeding, in which the defense of federal preemption could be raised and adjudicated. The Eleventh Circuit, however, reversed, holding abstention unwarranted under the circumstances. The court said:

> *Younger* does not automatically require abstention in every action seeking to enjoin a pending state proceeding in which a federal defense may be asserted. The Supreme Court stated as much in *Moore v. Sims,* 442 U.S. 415, 423, n. 8, 99 S.Ct. 2371, 2377, n. 8, 60 L.Ed.2d 994 (1979), where it specifically disclaimed even a remote suggestion that the *Younger* principle was applicable in every such case unless one of the explicit *Younger* exceptions was present. It is necessary to consider and weigh the nature and importance of the state's interest at stake and those of the nation's interest, and those matters must be viewed in the light of the issues to be resolved in the state proceeding.
>
> . . . .
>
> It would be an overstatement to suggest that when the federal question is

---

2. The Attorney General asserts the CIDs themselves constitute a pending state proceeding, but that is not so. CIDs may be issued not only to targets or subjects of an investigation, but also to witnesses. Unless and until someone files a proceeding in court, CIDs are simply part of an executive branch investigation. *See, e.g., In re Ezell,* 446 So.2d 253, 255 (Fla. 5th DCA 1984) (stating that a § 542.28 CID is not a court proceeding over which Florida Supreme Court has rule making authority but is instead only an "investigative tool through which the attorney general may exercise his obligation as chief legal offi-

cer of the state, to investigate, independently of any court proceedings, suspected violations of the state or federal antitrust laws"). Far from part of a legal proceeding, a CID may be issued only *before* a legal proceeding is filed; once the Attorney General files suit, he may no longer issue CIDs. *See* § 542.28(1), Fla. Stat. (2001). Moreover, it seems likely that the vast majority of CIDs result merely in compliance, with no court proceeding ever filed by anyone, unless the investigation leads to the filing of an enforcement action, which may or may not occur.

one of preemption, abstention under the principle of *Younger v. Harris* is never appropriate. *When preemption is readily apparent, however, and, because of preemption, the state tribunal is acting beyond the lawful limits of its authority, abstention can serve no principle of comity or of "our federalism."* Empire, Inc. v. Ashcroft, 524 F.Supp. 898 (W.D.Mo.1981).

*Baggett,* 717 F.2d at 523–24 (emphasis added).

In the case at bar, as in *Baggett,* "preemption is readily apparent"; as set forth below, the United States Supreme Court has squarely resolved the issue in case after case, and there is binding Eleventh Circuit precedent to the same effect. In the case at bar, as in *Baggett,* the state (in that case a "state tribunal," in this case a state officer, because no proceeding is pending and no "tribunal" has become involved) "is acting beyond the lawful limits of its authority." In the case at bar, as in *Baggett,* abstention can serve no principle of comity or of "our federalism."

In short, this is a classic challenge under federal law to action by a state executive officer as authorized by *Ex parte Young.* Because no state proceeding is pending, and because in any event the state officer's proposed action is clearly preempted by federal law, abstention is not required.

## IV

### The Merits

■ Under an unbroken line of United States Supreme Court decisions,[3] as well as under numerous decisions of lower courts,[4] including the United States Court of Appeals for the Eleventh Circuit,[5] the federal antitrust laws do not apply to the "business of baseball"; the business of baseball is, as it is sometimes phrased, exempt from the antitrust laws. The exemption applies as well to state antitrust laws, which are, to the extent otherwise applicable to baseball, invalid.[6]

The Attorney General asserts the exemption applies only to the "reserve clause," part of the contract between clubs and players reserving each club's right to its players, subject to various terms. The Attorney General's assertion cannot be squared with the plain language and clear import of the many reported cases in this area. Nor can the Attorney General's assertion be squared with the United States Supreme Court's oft repeated rationale for continuing to recognize the exemption of the business of baseball: that any change in this long standing interpretation of the antitrust laws should come from Congress

**3.** See *Flood v. Kuhn,* 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972); *Toolson v. New York Yankees, Inc.,* 346 U.S. 356, 74 S.Ct. 78, 98 L.Ed. 64 (1953); *Federal Baseball Club v. National League,* 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898 (1922).

**4.** See, e.g., *Triple–A Baseball Club Assocs. v. Northeastern Baseball, Inc.,* 832 F.2d 214 (1st Cir.1987); *Erving v. Virginia Squires Basketball Club,* 468 F.2d 1064 (2d Cir.1972); *Kowalski v. Chandler,* 202 F.2d 413 (6th Cir.1953); *Charles O. Finley & Co. v. Kuhn,* 569 F.2d 527 (7th Cir.1978); *Portland Baseball Club, Inc. v. Baltimore Baseball Club, Inc.,* 282 F.2d 680 (9th Cir.1960); *Smith v. Pro Football, Inc.,*

593 F.2d 1173 (D.C.Cir.1978); *Morsani v. Major League Baseball,* 79 F.Supp.2d 1331 (M.D.Fl.1999); *McCoy v. Major League Baseball,* 911 F.Supp. 454 (W.D.Wash.1995); *New Orleans Pelicans Baseball, Inc. v. National Association of Professional Baseball Leagues, Inc.,* 1994 WL 631144 (E.D.La.1994); *Minnesota Twins Partnership v. State,* 592 N.W.2d 847 (Minn.1999); *State v. Milwaukee Braves,* 31 Wis.2d 699, 144 N.W.2d 1 (Wis.1966).

**5.** *Professional Baseball Schools and Clubs, Inc. v. Kuhn,* 693 F.2d 1085 (11th Cir.1982).

**6.** See *Flood v. Kuhn,* 407 U.S. at 284–85, 92 S.Ct. 2099.

(which has left the decisions intact in relevant respects for now 79 years), not from the courts.

Although one might think it sufficient to dispose of this issue simply by citing the Supreme Court (and Eleventh Circuit) decisions on point, the Attorney General asserts their inapplicability so adamantly that a more detailed discussion seems appropriate. Moreover, two courts, a United States District Court in Pennsylvania [7] and the Florida Supreme Court,[8] have adopted a contrary reading of the cases, further confirming the need for close examination.

In Part A of this section of this opinion, I address in excruciating detail the Supreme Court's decisions regarding the exemption of baseball from the federal antitrust laws. In Part B, I address the Eleventh Circuit's decision on this subject, which is squarely controlling and would be dispositive of the issue, standing alone. In Part C, I address the Attorney General's contention that even if the exemption covers the "business of baseball," the proposed contraction of Major League Baseball from 30 clubs to 28 nonetheless is not, or may not be, part of the exempt "business of baseball." In Part D, I address the impact of the federal antitrust exemption on the Florida Antitrust Act. Finally, in part E, I address the Attorney General's contention that his CIDs can be sustained under other provisions of Florida law, even if the federal and state antitrust laws are indeed inapplicable to the proposed contraction.

## A. The Baseball Exemption in the Supreme Court

The United States Supreme Court has issued three opinions in baseball antitrust cases, each time holding the antitrust laws

inapplicable to the business of baseball, and never suggesting in the slightest that the result turned on whether the antitrust claim at issue did or did not involve the reserve clause. Other decisions of the Supreme Court confirm this result.

The first baseball case was *Federal Baseball Club v. National League*, 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898 (1922). The case arose from the attempt of a new league-known as the "Federal League"—to compete with the National and American Leagues, which then, as now, constituted the major leagues. The new venture failed, and one of its clubs sued the National and American Leagues and their member clubs, asserting that they "destroyed the Federal League by buying up some of the constituent clubs and in one way or another inducing all those clubs except the plaintiff to leave their League...." *Federal Baseball*, 259 U.S. at 207, 42 S.Ct. 465.

The Supreme Court upheld a judgment for the defendants, concluding that the Sherman Act, which was then just 32 years old, did not apply to major league baseball. The Court said that baseball games "would not be called trade or commerce in the commonly accepted use of those words," and that major league baseball thus was not interstate commerce, despite the incidental travel of players and fans in connection with the games. *Federal Baseball*, 259 U.S. at 209, 42 S.Ct. 465.

The Court gave no indication this result had anything to do with the reserve clause. Indeed, the Court mentioned the reserve clause only once, *after* concluding its analysis of the inapplicability of the antitrust laws to baseball. The Court said:

> If we are right [that baseball games are purely state affairs] the plaintiff's

---

7. *Piazza v. Major League Baseball*, 831 F.Supp. 420 (E.D.Pa.1993).

8. *Butterworth v. National League*, 644 So.2d 1021 (Fla.1994).

business is to be described in the same way and the restrictions by contract that prevented the plaintiff from getting players to break their bargains *and the other conduct charged against the defendants* were not an interference with commerce among the States.

*Federal Baseball,* 259 U.S. at 209, 42 S.Ct. 465 (emphasis added). The "other conduct" to which the Court referred presumably was that described at the outset of the opinion: "destroy[ing] the Federal League by buying up some of the constituent clubs and in one way or another inducing all those clubs except the plaintiff to leave their League...." *Federal Baseball,* 259 U.S. at 207, 42 S.Ct. 465. The assertion that this was solely a reserve clause case is simply not true.[9] *Federal Baseball* held that professional baseball, not just the reserve clause, was outside the scope of the antitrust laws.

The Supreme Court next addressed the applicability of the antitrust laws to baseball in *Toolson v. New York Yankees, Inc.,* 346 U.S. 356, 74 S.Ct. 78, 98 L.Ed. 64 (1953). That consolidated decision dealt with three different antitrust cases against major league baseball clubs. The cases were dismissed by the district courts, and the dismissals were affirmed by the courts of appeals, on the authority of *Federal Baseball.* The Supreme Court upheld the dismissals in a single paragraph:

> In *Federal Baseball Club of Baltimore v. National League of Professional Baseball Clubs,* 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898 (1922), this Court held that *the business of providing public baseball games* for profit between clubs of professional baseball players was not within the scope of the federal antitrust laws. Congress has had the ruling under consideration but has not seen fit to bring *such business* under these laws by legislation having prospective effect. The *business* has thus been left for thirty years to develop, on the understanding that *it* was not subject to existing antitrust legislation. The present cases ask us to overrule the prior decision and, with retrospective effect, hold the legislation applicable. We think that if there are evils *in this field* which now warrant application to it of the antitrust laws it should be by legislation. Without re-examination of the underlying issues, the judgments below are affirmed on the authority of Federal Baseball Club of Baltimore v. National League of Professional Baseball Clubs, supra, so far as that decision determines that Congress had no intention of including *the business of baseball* within the scope of the federal antitrust laws.

*Toolson,* 346 U.S. 356–57, 74 S.Ct. 78 (emphasis added).

Although the three cases addressed in *Toolson* had been brought by baseball players and dealt overwhelmingly with reserve clause issues, the Supreme Court did not even mention that in its opinion, and its language gave not a hint that the applicability of the antitrust laws turned on that circumstance. Instead, the Court said that in *Federal Baseball* it had held that "the business of providing public baseball games for profit between clubs of professional baseball players was not within the

---

**9.** In *Piazza v. Major League Baseball,* 831 F.Supp. 420 (E.D.Pa.1993), the court concluded that *Federal Baseball* was really just a reserve clause case, citing the opinion of the lower court. *See National League v. Federal Baseball Club,* 269 F. 681 (C.C.D.C.1920). Whatever the lower court might have thought, the Supreme Court thought *Federal Baseball* dealt with other issues, over and above the reserve clause. It is an odd approach to interpreting Supreme Court cases to disregard that Court's own description of a case in favor of a lower court's description.

scope of the federal antitrust laws." The Court explicitly adhered to that decision so far as it held the "business of baseball" exempt from the antitrust laws. The Court said that any change in that approach would have to come from Congress, not from the Court.

It is impossible to glean from *Toolson* any inkling that the applicability of the antitrust laws to baseball turned on whether the issue was the reserve clause, on the one hand, or something else, on the other. Quite to the contrary, it was the "business of baseball" that was exempt, and that, according to the Court, was to remain exempt, unless and until Congress said otherwise.

Before the Supreme Court would decide its third baseball antitrust case, it dealt with attempts to expand the baseball exemption into other areas. In *United States v. Shubert*, 348 U.S. 222, 75 S.Ct. 277, 99 L.Ed. 279 (1955), the Court held local theater exhibitions not exempt, rejecting the assertion that *Federal Baseball* and *Toolson* required a contrary result. The Court said that in *Federal Baseball* it "was dealing with the *business of baseball* and nothing else." *Shubert*, 348 U.S. at 228, 75 S.Ct. 277 (emphasis added). The Court said that in *Toolson* it was faced with a long standing decision that Congress had considered but had elected not to change and that, as a result, the Court had simply adhered to *Federal Baseball*, "so far as that decision determines that Congress had no intention of including the *business of baseball* within the scope of the

federal antitrust laws." *Shubert*, 348 U.S. at 230, 75 S.Ct. 277 (emphasis added), *quoting Toolson*, 346 U.S. at 356, 74 S.Ct. 78. Had the baseball exemption been limited to the reserve clause, the Court surely would have said so; that would, after all, have provided a succinct and irrefutable basis for rejecting the claim that the same exemption should apply to the theater, which has no reserve clause. But the Court did not say this, for one reason: the exemption was (and is) for the business of baseball, not just the reserve clause.

In *United States v. International Boxing Club*, 348 U.S. 236, 75 S.Ct. 259, 99 L.Ed. 290 (1955), decided the same day as *Shubert*, the Court held the antitrust laws applicable to boxing, saying that *Federal Baseball* did not hold all professional sports beyond the scope of the antitrust laws. The Court said:

> The issue before us is, therefore, not whether a previously granted exemption should continue, but whether an exemption should be granted in the first instance. And that issue is for Congress to resolve, not this Court.

*International Boxing*, 348 U.S. at 243, 75 S.Ct. 259. The Court referred to baseball's reserve clause not at all, an odd approach if, as the Attorney General now asserts, the baseball exemption really only applied to the reserve clause, which has no counterpart in boxing. If the exemption were only for the reserve clause, one would have expected the Court to say so in rejecting the claimed exemption for boxing.[10]

10. Indeed, in dissent Justice Frankfurter, a jurist of no small intellect, said it would "baffle the subtlest ingenuity to find a single differentiating factor between other sporting exhibitions, whether boxing or football or tennis, and baseball insofar as the conduct of the sport is relevant to the criteria or considerations by which the Sherman Law becomes applicable to a 'trade or commerce.' "

348 U.S. at 248, 75 S.Ct. 259. Justice Frankfurter underestimated the Florida Attorney General's subtle ingenuity: baseball has a reserve clause, but boxing does not. Had the baseball exemption been limited to the reserve clause, this distinction between baseball and boxing would not have been so baffling to the justices of the Supreme Court, who missed it clean.

Next came *Radovich v. National Football League,* 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957), an antitrust case brought by a football player challenging practices very similar to those taken under baseball's reserve clause. The Ninth Circuit held for the NFL, concluding that football, like baseball but unlike boxing, was a team sport. If the baseball antitrust exemption had turned on the reserve clause, one might have expected the Supreme Court to affirm, but it reversed. The Court made clear that the antitrust exemption of the business of baseball was just that: an exemption of the business of baseball, created long ago and never changed by Congress, that would remain in existence but would be limited to the business of baseball. After discussing *Federal Baseball* and *Toolson* and the Court's earlier statements "limiting them to baseball," the Court said:

> [W]e now specifically limit the rule there established to the facts there involved, *i.e., the business of organized professional baseball.* As long as Congress continues to acquiesce we should adhere to—but not extend—the interpretation of the Act made in those cases.

*Radovich,* 352 U.S. at 451, 77 S.Ct. 390 (emphasis added). The Court suggested not at all that the rule of *Federal Baseball* or *Toolson* was limited to the reserve clause; instead, the Court very explicitly defined the antitrust exemption as applicable to "the business of organized professional baseball." And the Court continued,

> [W]ere we considering the question of baseball for the first time upon a clean slate we would have no doubts. But Federal Base Ball held the *business of baseball* outside the scope of the Act. No other business claiming the coverage of those cases has such an adjudication. We, therefore, conclude that the orderly

way to eliminate error or discrimination, if any there be, *is by legislation and not by court decision.*

*Radovich,* 352 U.S. at 452, 77 S.Ct. 390 (emphasis added). The Attorney General's assertion now that the rationale of *Federal Baseball* (that big league baseball is not interstate commerce) has been undermined, and that the case thus should be limited narrowly to its facts (purportedly only the reserve clause) simply ignores the undeniable truth that, long after it was clear that big league baseball was interstate commerce, the Court still adhered to the explicit exemption for the "business of baseball," not based on any outdated view of interstate commerce, but because of the rationale (still just as applicable today) that any change in this long standing interpretation of the antitrust laws should come from Congress, not the courts. *That* rationale has not been questioned by the Court nor undermined by the passage of time.

It was against this backdrop that the Court addressed its third and most recent baseball antitrust case, *Flood v. Kuhn,* 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972). Curt Flood, one of the game's great center fielders, brought an antitrust action challenging the reserve clause. The district court and court of appeals rejected the claim, as did the Supreme Court. The Court recounted in detail its earlier decisions in this area, including all those discussed above. The Court acknowledged again, as it had done earlier, that if the slate were clean, the business of baseball would not garner an exemption from the antitrust laws. But the Court also said again, as it had said earlier, that the long history of decisions holding the business of baseball exempt ought not be changed by the judiciary. The Court explicitly adhered to the exemption, saying any change would have to come from Congress.

The Court's statements to this effect were numerous, and they were by no means limited to the reserve clause. While the fact that the case involved the reserve clause was mentioned, there was not the slightest suggestion that that was significant to the result. Not once did the Court intimate in any way that it was only the reserve clause that was exempt. To the contrary, the Court's articulation of the exemption was always phrased as the business of baseball, never as simply the reserve clause.

Thus, for example, after starting its discussion with a description of *Federal Baseball,* the Court noted that that decision had been "generally and necessarily accepted as controlling authority" by lower courts. *Flood,* 407 U.S. at 272, 92 S.Ct. 2099. The examples the Court cited included cases having nothing to do with the reserve clause. *See, e.g., State v. Milwaukee Braves, Inc.,* 31 Wis.2d 699, 144 N.W.2d 1 (1966) (holding proposed transfer of Braves from Milwaukee to Atlanta exempt from antitrust challenge). Had the Court believed its earlier decisions recognizing an antitrust exemption could properly be limited to the reserve clause, it surely would not have said the lower courts "necessarily" found those cases controlling in other contexts, but it did. The Court's

point was that *Federal Baseball* had long been followed, and properly so, thus supporting the conclusion that any change should come only from Congress.

The *Flood* Court next discussed *Toolson,* which, the Court said, cited *Federal Baseball* "as holding 'that the *business of providing public baseball games* for profit between clubs of professional baseball players was not within the scope of the federal antitrust laws.' " *Flood,* 407 U.S. at 273, 92 S.Ct. 2099 (emphasis added), *quoting Toolson,* 346 U.S. at 357, 74 S.Ct. 78. The Court said *Toolson* adhered to *Federal Baseball* "so far as that decision determines that Congress had no intention of including the *business of baseball* within the scope of the federal antitrust laws." *Flood,* 407 U.S. at 273, 92 S.Ct. 2099 (emphasis added), *quoting Toolson,* 346 U.S. at 357, 74 S.Ct. 78. The Court said, "The emphasis in *Toolson* was on the determination, attributed even to *Federal Baseball,* that Congress had no intention to include *baseball* within the reach of the federal antitrust laws." *Flood,* 407 U.S. at 274, 92 S.Ct. 2099 (emphasis added). There was not a hint that *Toolson's* holding or rationale could be limited to the reserve clause or that the Court intended now so to confine it.[11]

---

**11.** To be sure, the Court itemized four reasons for the result in *Toolson:*

(a) Congressional awareness for three decades of the Court's ruling in Federal Baseball, coupled with congressional inaction. (b) The fact that baseball was left alone to develop for that period upon the understanding that the reserve system was not subject to existing federal antitrust laws. (c) A reluctance to overrule Federal Baseball with consequent retroactive effect. (d) A professed desire that any needed remedy be provided by legislation rather than by court decree.

407 U.S. at 273–74, 92 S.Ct. 2099. In saying that baseball was left to develop on the understanding that the reserve clause was not sub-

ject to the antitrust laws, the Court did not say any other aspect of baseball *was* subject to the antitrust laws, and the Court immediately made clear that any such suggestion would be wrong. In the very next sentence after the quotation just given, the Court said that the "emphasis" in *Toolson* was that "Congress had no intention to include *baseball* within the reach of the federal antitrust laws." *Id.* (emphasis added). In context, it is clear that the reference in the quotation to the reserve clause was simply a reference to the aspect of the business of baseball that happened to be involved in *Toolson,* just as, in the very same sentence, the Court referred to "that period," that is, the period between 1922 and 1953. Just as the rule of *Toolson* was not applicable only to events between 1922 and 1953, so also

The *Flood* Court next discussed *Shubert*. The Court said that in *Federal Baseball* the Court "was dealing with the *business of baseball* and nothing else." *Flood*, 407 U.S. at 275, 92 S.Ct. 2099 (emphasis added), *quoting Shubert*, 348 U.S. at 228, 75 S.Ct. 277. The Court quoted *Toolson* as adhering to *Federal Baseball* "so far as that decision determines that Congress had no intention of including the *business of baseball* within the scope of the federal antitrust laws." *Flood*, 407 U.S. at 275, 92 S.Ct. 2099 (emphasis added), *quoting Shubert*, 348 U.S. at 230, 75 S.Ct. 277, *quoting Toolson*, 346 U.S. at 357, 74 S.Ct. 78. The Court ended by quoting *Shubert* as saying that, "If the *Toolson* holding is to be expanded—or contracted—the appropriate remedy lies with Congress." *Flood*, 407 U.S. at 276, 92 S.Ct. 2099, *quoting Shubert*, 348 U.S. at 230, 75 S.Ct. 277. Again, there was not a hint that the baseball antitrust exemption was applicable only to the reserve clause or that that was even an issue.

The *Flood* Court next discussed *International Boxing*, again without any suggestion that the baseball antitrust exemption turned on whether the issue arose from the reserve clause, and indeed without even mentioning the reserve clause. The Court quoted *International Boxing's* statement that, but for the *Federal Baseball* and *Toolson*, baseball would be subject to the antitrust laws, and further quoted *International Boxing's* statement that any change in those earlier decisions was an issue "for Congress to resolve, not this Court." *Flood*, 407 U.S. at 277, 92 S.Ct.

2099, *quoting International Boxing*, 348 U.S. at 243, 75 S.Ct. 259.[12]

The *Flood* Court next discussed *Radovich*. The Court quoted *Radovich's* explicit delineation of the antitrust exemption established by *Federal Baseball* and *Toolson:* "we now specifically limit the rule there established to the facts there involved, i.e., *the business of organized professional baseball.*" *Flood*, 407 U.S. at 279, 92 S.Ct. 2099 (emphasis added), quoting *Radovich*, 352 U.S. at 451, 77 S.Ct. 390. The Court noted *Radovich's* statement that the result would be different if there were a clean slate, but it noted that *Federal Baseball* "held the *business of baseball* outside the scope" of the antitrust laws. *Flood*, 407 U.S. at 279, 92 S.Ct. 2099 (emphasis added), *quoting Radovich*, 352 U.S. at 452, 77 S.Ct. 390. The *Flood* Court noted that in *Radovich* (as throughout this line of cases), the Court said that the appropriate method for any change "is by legislation and not by court decision." *Flood*, 407 U.S. at 279, 92 S.Ct. 2099, *quoting Radovich*, 352 U.S. at 452, 77 S.Ct. 390. The reserve clause was not mentioned in the *Flood* Court's discussion of *Radovich*.

The Court concluded this discussion of its cases by saying they "understandably spawned extensive commentary, some of it mildly critical and much of it not; *nearly all of it looked of Congress for any remedy that might be deemed essential.*" *Flood*, 407 U.S. at 280–81, 92 S.Ct. 2099 (emphasis added; footnote omitted). The Court

the rule was not limited to the reserve clause, as the Court's own explicit and repeated description of the rule, in *Toolson* and *Flood* and the other cases discussed in the text above, made clear.

12. As part of its discussion of *International Boxing*, the *Flood* Court also quoted Justice Frankfurter's statement in dissent that any

effort to distinguish boxing and baseball would "baffle the subtlest ingenuity." The *Flood* Court, like the *International Boxing* Court, did not even conceive the distinction on which the Attorney General now relies: that the baseball exemption was really only a reserve clause exemption. *See* footnote 10 *supra*.

then noted that, since *Toolson*, more than 50 bills had been introduced in Congress relating to the applicability of the antitrust laws to baseball, but that no limitation on the exemption had passed. 407 U.S. at 281–82, 92 S.Ct. 2099.

The Court next listed eight conclusions. First, the Court said, as had been obvious for decades, that professional baseball was a business (none of the Court's cases had ever denied this) and was engaged in interstate commerce (as was denied in *Federal Baseball* but never again).

Second, the Court said *Federal Baseball* and *Toolson* "have become an aberration *confined to baseball.*" *Flood*, 407 U.S. at 282, 92 S.Ct. 2099 (emphasis added).[13]

Third, the Court said this aberration had been recognized in five consecutive cases (*Federal Baseball, Toolson, Shubert, International Boxing* and *Radovich*) and had "been with us now for half a century," having been deemed "*fully* entitled to the benefit of stare decisis" and thus having survived the Court's expanding definition of interstate commerce. *Flood*, 407 U.S. at 282, 92 S.Ct. 2099 (emphasis added).[14] Now three decades later, the baseball ex-

emption of course has been with us for nearly 80 years.

Fourth, the Court said other professional sports, including "football, boxing, basketball, and, presumably, hockey and golf," were not "so exempt." 407 U.S. at 282–83, 92 S.Ct. 2099. Boxing and golf of course have no reserve clause, so a reference to their not being "so exempt" would have made no sense if the Court had believed the baseball exemption was really only a baseball reserve clause exemption.

Fifth, the Court said the advent of radio and television, with their increased coverage and revenues, had not occasioned an overruling of *Federal Baseball* and *Toolson*.

Sixth, the Court said it had "emphasized" that since 1922 "baseball" had been allowed to develop and to expand unhindered by federal legislative action, with full and continuing congressional awareness. *Flood*, 407 U.S. at 283, 92 S.Ct. 2099. The Court noted that remedial legislation had been introduced repeatedly in Congress but none had been enacted; the Court deemed this "something other than mere congressional silence and passivity." *Id.*[15]

**13.** Immediately before this statement, the Court said that "[w]ith its reserve system enjoying exemption from the federal antitrust laws, baseball is, in a very distinct sense, an exception and an anomaly." *Id.* The statement that the antitrust-exempt reserve system makes baseball an anomaly is hardly a statement that it is only the reserve system that is exempt from the antitrust laws. The Court's very next sentence confirmed this, explicitly saying that *Federal Baseball* and *Toolson* "are confined to baseball." The Court did *not* say those decisions were confined to baseball's reserve clause. As set forth in the text, on numerous other occasions, in *Flood* and earlier decisions, the Court very clearly articulated the exemption as applicable to the business of baseball, not merely the reserve clause. Each and every time the Court defined the exemption, it defined it as applicable to the "business of baseball" or an equivalent; the Court

never defined the exemption as applicable only to the reserve clause.

**14.** Inexplicably, the Eastern District of Pennsylvania and Florida Supreme Court cases on which the Attorney General now relies concluded that *Federal Baseball* and *Toolson* were not "fully entitled to the benefit of stare decisis" but only a limited version thereof. The United States Supreme Court explicitly said the contrary.

**15.** The Court also said, as part of this discussion, that it had concluded that "Congress as yet has had no intention to subject baseball's reserve system to the reach of the antitrust statutes." *Id.* Some of the bills introduced in Congress had addressed only the reserve system; indeed, Congress now has passed legislation speaking only to the reserve system, not

Seventh, the Court noted that it had "expressed concern about the confusion and the retroactivity problems that inevitably would result with a judicial overturning of *Federal Baseball.*" 407 U.S. at 283, 92 S.Ct. 2099. The Court said it had "voiced a preference that if any change is to be made, it come by legislative action that, by its nature, is only prospective in operation." *Id.* The confusion and retroactivity problems to which the Court referred of course would arise as much from the Attorney General's proposed after-the-fact reinterpretation of *Federal Baseball* and the other cases as from any explicit overruling of them.

Eighth, the Court said that, as noted in *Radovich,* "the slate with respect to *baseball* is not clean," *id.* (emphasis added), and indeed had not been clean for half a century. The Court did not say the unclean slate dealt only with the reserve clause; instead, the Court identified the subject of the earlier decisions as "baseball," without limitation.

The Court then summarized its holding, explicitly choosing to adhere to, not limit, the decisions in *Federal Baseball* and *Toolson,* as well as *International Boxing* and *Radovich,* and choosing, yet again, to leave any change in the area to Congress. The Court said:

> Accordingly, we adhere once again to Federal Baseball and Toolson and to their application to *professional baseball.* We adhere also to International

Boxing and Radovich and to their respective applications to professional boxing and professional football. If there is any inconsistency or illogic in all this, it is an inconsistency and illogic of long standing that is to be remedied by the Congress and not by this Court. *If we were to act otherwise, we would be withdrawing from the conclusion as to congressional intent made in Toolson and from the concerns as to retrospectivity therein expressed.* Under these circumstances, there is merit in consistency even though some might claim that beneath that consistency is a layer of inconsistency.

407 U.S. at 284, 92 S.Ct. 2099 (emphasis added).

In sum, although in *Flood* the Court was asked to overrule *Federal Baseball* and *Toolson,* the Court explicitly declined to do so, holding instead that the business of baseball was exempt from the antitrust laws, just as *Federal Baseball* and *Toolson* had said. The Court reached this result not based on any original antitrust analysis but instead because of its explicit determination that any change should come from Congress. *Flood* was, therefore, not so much a decision about antitrust law as about the appropriate role of the judiciary within our constitutional system. The Sherman Act had been in effect for 82 years. For 50 of those years, the Sherman Act had been interpreted as inapplicable to the business of baseball. Congress had considered the issue many times but

the other aspects of the business of baseball. *See* 15 U.S.C. § 27a. It was the reserve system that was specifically challenged in *Flood.* The Court's statement that Congress had not chosen to apply the antitrust laws to the reserve system-despite legislation that would have done so-was an accurate statement of the congressional inaction that was critical to the outcome of *Flood.* The Court never suggested in any way, however, that only the reserve system was exempt; to the contrary,

in the immediately preceding sentence, the Court said "baseball" had been allowed to develop since 1922 unhindered by the antitrust laws. The Court had said repeatedly, in *Flood* and the earlier decisions, that the "business of baseball," not merely the reserve clause, was exempt from the antitrust laws. The suggestion that the Court's reference to the reserve clause shows that in all those other instances the Court did not mean what it said simply will not withstand analysis.

had never changed the result: the business of baseball remained exempt. The Court held that, unless and until changed by the Congress, that would remain the law.

Phrased differently, *Flood* was a ruling not about whether the antitrust exemption should be terminated but about *who* should make that decision. The Court determined that the decision whether to terminate baseball's antitrust exemption should be made by Congress, not by the Court. That was explicitly the basis for *Flood's* holding. The Court's rationale remains every bit as valid today as it was when *Flood* was decided.

Nothing of substance has changed since *Flood.* The arguments for and against application of the antitrust laws to baseball are about the same. More significantly, the arguments for and against having the courts, rather than Congress, make any change in this area also are the same today as they were when *Flood* was decided, except that now nearly 30 more years have passed without congressional action.[16]

*Flood* constitutes an unequivocal, binding decision of the United States Supreme Court, establishing that the business of baseball is exempt from the antitrust laws, as it has been since 1922, and as it will remain unless and until Congress decides otherwise. Period.

**B. *The Baseball Exemption in the Eleventh Circuit***

The United States Court of Appeals for the Eleventh Circuit addressed the baseball exemption in *Professional Baseball Schools and Clubs, Inc. v. Kuhn,* 693 F.2d 1085 (11th Cir.1982). That was an antitrust case brought by the holder of a franchise in the Carolina League—one of the so—called minor leagues operated in cooperation with the major leagues—challenging the player assignment system, the franchise location system, the alleged monopolization of professional baseball, and the rule requiring members of the Carolina League to play games only against certain opponents. The district court dismissed the case for lack of subject matter jurisdiction, and the Eleventh Circuit affirmed, holding the antitrust exemption of the business of baseball so well established that the complaint was insufficient even to sustain federal jurisdiction. The court said:

> Although it may be anomalous, the exclusion of the *business of baseball* from the antitrust laws is well established. *Flood v. Kuhn,* 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972); *Toolson v. New York Yankees,* 346 U.S. 356, 74 S.Ct. 78, 98 L.Ed. 64 (1953); *Federal Baseball Club of Baltimore, Inc. v. Na-*

---

**16.** Plaintiffs assert that the Curt Flood Act, 15 U.S.C. § 27a, adopted in 1998, constitutes an endorsement by Congress of the exemption of the business of baseball. I disagree. In that Act, Congress expressly subjected matters directly affecting employment of baseball players (including the reserve clause) to the antitrust laws, to the same extent those laws are applicable to other professional sports. But Congress also made clear that this did not render the antitrust laws applicable to baseball in any other respect. *See* 15 U.S.C. § 27a(b). Properly construed, this does not affect the issues in the case at bar one way or the other, because Congress explicitly indicat-

ed its intention not to affect issues other than direct employment matters. Thus Congress said, "No court shall rely on the enactment of this section as a basis for changing the application of the antitrust laws to any conduct, acts, practices, or agreements other than" player issues. *Id.* I take Congress at its word and resolve this case without reliance on the Curt Flood Act as affecting the outcome one way or the other. I conclude that the business of baseball *is* exempt; the exemption was well established long prior to adoption of the Curt Flood Act and certainly was not *repealed* by that Act.

*tional League of Professional Baseball Clubs,* 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898 (1922). Each of the activities appellant alleged as violative of the antitrust laws plainly concerns matters that are an integral part of the *business of baseball.* The district court therefore properly dismissed the antitrust claims for want of subject matter jurisdiction.

693 F.2d at 1085–86 (emphasis added).

This is a square and binding holding of the Eleventh Circuit that the "business of baseball," not just the reserve clause, is exempt from the antitrust laws. The franchise location system and rule requiring teams only to play specified opponents have nothing to do with the reserve clause, but they were held exempt. The Attorney General has suggested no possible reading of *Professional Baseball Schools* that is not fatal to his position on the merits in this court.[17]

## C. *Applying the Baseball Exemption to Contraction*

██ The Attorney General asserts that, even if the "business of baseball" is exempt from the antitrust laws, that does not necessarily dispose of this case, because, the Attorney General says, the proposed contraction may not be part of the "business of baseball."

It is difficult to conceive of a decision more integral to the business of major league baseball than the number of clubs that will be allowed to compete. It might be possible to have an open and unrestricted assortment of teams, with new teams being formed and entering the fray at will, and with each team playing whatever other teams it chooses, whenever it chooses. But that would not be major league baseball as it developed before 1922 and as it has continued to exist. To the contrary, since before *Federal Baseball,* there has always been a defined National League and a defined American League, each with a set number of specific clubs, and there has always been a schedule of games involving major league clubs only. That league structure—and the ability to keep out the competing Federal League—were part of the business of baseball that *Federal Baseball* held exempt from antitrust scrutiny. The basic league structure, including the number of teams, remains an essential feature of the business of baseball, exempt from the antitrust laws. *Professional Baseball Schools,* a binding decision of the Eleventh Circuit, so held, and it did so not based on any factual record, but on a motion to dismiss.[18]

17. The Attorney General notes that the Eleventh Circuit's opinion was brief and included little analysis. Far from a reason to disregard the holding, this simply confirms that the issue was easy and the result clear; the Supreme Court had thrice resolved the matter. The instant opinion to the contrary notwithstanding, lower courts are not in the habit of writing long and detailed opinions on issues squarely resolved by controlling decisions of higher courts; there is quite enough other work to do. And in any event, short decisions of the Eleventh Circuit are no less binding in this court than long ones.

18. The Attorney General asserts that the contraction decision may have been motivated by economic (and indeed anti-competitive) concerns rather than concern for the nature and quality of the game. For two reasons, this does not help the Attorney General. First, the applicability of the antitrust exemption does not turn on whether any antitrust claim would otherwise be well founded; the whole point is that the antitrust laws do not apply, thus exempting even anti-competitive conduct from liability. Second, the Attorney General's apparent assertion that economics, on the one hand, and the nature and quality of the game, on the other, are wholly separate concerns is obviously incorrect; at least dating to the sale of Babe Ruth by the Red Sox, the interplay between economics and the nature and quality of the game has been obvious. It would be irrational for club owners to ignore economics, which in the long run (and proba-

## D. *Applicability of the Florida Antitrust Act*

The Florida Antitrust Act explicitly exempts the same subjects as are exempt under federal law:

> Any activity of conduct exempt under Florida statutory or common law or exempt from the provisions of the antitrust laws of the United States is exempt from the provisions of this chapter.

§ 542.20, Fla. Stat. (2001). The Florida legislature adopted this provision in 1980, just eight years after *Flood v. Kuhn* was decided, presumably with full knowledge of the baseball exemption. Any contention that the Florida Antitrust Act applies to the business of baseball thus fails for the same reasons the contention fails with respect to federal law.[19]

Moreover, any effort to apply the Florida Antitrust Act to the business of baseball would remain invalid even if the Act by its terms did not incorporate the federal exemption. The United States Supreme Court held in *Flood v. Kuhn* that state antitrust laws could not be applied to the business of baseball because state antitrust regulation would conflict with federal policy, would prevent needed national uniformity in the regulation of baseball, and thus would run afoul of the Commerce Clause. The Court said:

> The petitioner's argument as to the application of state antitrust laws deserves a word. Judge Cooper rejected the state law claims because state antitrust regulation would conflict with federal policy and because national 'uniformity (is required) in any regulation of baseball and its reserved system.' [*Flood v. Kuhn,*] 316 F.Supp., [271] at 280 [(S.D.N.Y.1970)]. The Court of Appeals, in affirming, stated, '(A)s the burden on interstate commerce outweighs the states' interests in regulating baseball's reserve system, the Commerce Clause precludes the application here of state antitrust law.' [*Flood v. Kuhn,*] 443 F.2d, [264] at 268 [(2d Cir.1971)]. *As applied to organized baseball,* and in the light of this Court's observations and holding in Federal Baseball, in Toolson, in Shubert, in International Boxing, and in Radovich, and despite baseball's allegedly inconsistent position taken in the past with respect to the application of state law, these statements adequately dispose of the state law claims.

*Flood,* 407 U.S. at 284–85, 92 S.Ct. 2099

bly the short) necessarily will impact the nature and quality of the game; and it would be irrational to ignore the nature and quality of the game, which in the long run (and probably the short) will impact economics. Any assertion that club owners should, could or ever did make a decision on the number of clubs in the league without considering both economics and other factors affecting the nature and quality of the game would be wholly fanciful. *Cf. Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (refusing to sustain antitrust claim based on inference that party acted in manner contrary to its own economic interests).

19. If this were the only basis for the conclusion that the business of baseball is exempt from the Florida Antitrust Act, a nice question would be presented concerning my authority to address the matter. Under *Pennhurst State School and Hosp. v. Halderman,* 465 U.S. 89, 121, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), the Eleventh Amendment bars an action for injunctive relief against a state official based on an alleged violation of state law. It may be unclear whether the holding would apply when, as here, the alleged violation is of a state law that by its terms explicitly incorporates a federal standard, so that, in effect, any injunction is based on an interpretation of federal law. I need not address the issue here, however, because, for the reasons set forth in the text that follows, the Florida Antitrust Act is inapplicable anyway, as a matter of federal law.

(emphasis added).[20]

The need for national uniformity is no less in the case at bar than it was in *Flood*. Major League Baseball cannot have 30 teams in Florida but 28 in another state. The Devil Rays and Marlins cannot be required to compete against a 29th or 30th team if the Yankees and Braves do not. And Major League Baseball cannot properly be required to eliminate only teams in other states, not Florida, just because the Florida courts, unlike those of any other state, view this as an matter for resolution in an antitrust court.

In short, the various states properly cannot, in the name of state antitrust laws, impose different standards in this area. The business of baseball, including the decision to contract, is exempt from the antitrust laws, federal and state.

### E. *Applying the Baseball Exemption to the CIDs at Issue*

As set forth above, the proposed contraction of Major League Baseball is exempt from the federal or state antitrust laws, and the Attorney General thus has no authority to enforce the antitrust laws against the proposed contraction or to issue CIDs as part of an investigation of whether to file an enforcement action. The Attorney General asserts, however, that he may investigate violations of the separate Florida Deceptive and Unfair Trade Practices Act, §§ 501.201 et seq.,

Florida Statutes ("DUTPA"), and that the CIDs at issue may be sustained under that Act.

■ The Attorney General is correct that neither the baseball antitrust exemption nor the Commerce Clause forecloses him from investigating violations of DUTPA. Plaintiffs do not assert the contrary. I conclude, however, that the instant CIDs may not be sustained on this basis, because (1) by their terms they were CIDs issued only under § 542.28, Florida Statues, part of the Florida Antitrust Act, not subpoenas issued under DUTPA, (2) they include interrogatories, as authorized in CIDs issued under the Antitrust Act but not in subpoenas issued under DUTPA, and (3) they describe the nature of the conduct being investigated solely in antitrust terms, not in terms of any alleged unfair or deceptive practices.

Each of the CIDs at issue is entitled, in large bold letters, "ANTITRUST CIVIL INVESTIGATIVE DEMAND." The text begins by stating:

This *antitrust civil investigative demand is issued pursuant to the Florida Antitrust Act of 1980, Section 542.28, Florida Statutes*, in the course of an official investigation to determine whether there is, has been or may be a violation of

Sections 542.18 or 542.19, Florida Statutes (parts of the Florida Antitrust Act

---

**20.** It is true that, within this quotation, there is a reference to the reserve system, but this does not help the Attorney General. The Court quoted the district court as saying there was a need for national uniformity "in any regulation of baseball *and* its reserve[] system." (*Id.*, emphasis added.) Had either the district court or Supreme Court intended this as a limitation of the exemption to the reserve system, the reference presumably would have been to the need for uniformity "in any regulation of baseball's reserve system," not the need for uniformity in regulation of "baseball

*and* its reserve system." Moreover, as part of this discussion, the Supreme Court, in its own language not quoted from the courts below, identified the scope of its decision as "organized baseball," not merely the reserve clause. In context, it is clear that the Court viewed the exemption as an exemption for "organized baseball," with the quotation of the district court's reference to the reserve system simply an accurate statement of the aspect of baseball involved in the particular case.

of 1980); sections 1 or 2 of the Sherman Antitrust Act (15 U.S.C. §§ 1, 2); Sections 501.201 et seq., Florida Statutes (Florida Deceptive and Unfair Trade Practices Act),

by conduct, activities or proposed action of the following nature:

possible *contracts, combinations, or conspiracies in restraint of trade, or monopolization, attempted monopolization, or combinations or conspiracies to monopolize trade or commerce,* relating to the proposed contraction and/or relocation of the Tampa Bay Devil Rays and/or the Florida Marlins.

Plaintiffs' Exhibits A–E (emphasis added).

These are, by their terms, antitrust CIDs, not DUTPA subpoenas. And this is not a matter of semantics; there are important differences. The differences include the grounds on which the Attorney General may issue a CID or subpoena;[21] the type of inquiry a CID or subpoena may include;[22] the procedures by which a CID or subpoena may be challenged or enforced;[23] and the confidentiality afforded information produced in response to the CID or subpoena.[24] This record establishes that the Attorney General issued antitrust CIDs; it does not establish that he could or would have issued DUTPA subpoenas, and in any event, if he had done so, different procedures would apply.

For the reasons set forth above, the Attorney General had no authority to issue antitrust CIDs to investigate the proposed contraction of Major League Baseball.[25] These antitrust CIDs thus are invalid.

## V

### Collateral Estoppel

The Attorney General asserts that the merits do not matter, because plaintiffs are bound by the Florida Supreme Court's decision in *Butterworth v. National League,* 644 So.2d 1021 (Fla.1994). That case arose from the proposed sale of the San Francisco Giants to a group of investors who intended to move the club to Tampa. The National League voted not to approve the sale. The Attorney General of Florida issued CIDs under § 542.28,

---

21. Under §§ 542.28 and 542.27(3), Florida Statutes, an antitrust CID may issue "[w]henever the Attorney General ... suspects that a violation of [the Florida Antitrust Act] or federal laws pertaining to restraints of trade is imminent, occurring, or has occurred." DUTPA, in contrast, authorizes issuance of subpoenas if the Attorney General "has reason to believe that a person has engaged in, or is engaging in, an act or practice that violates" DUTPA. § 501.206, Fla. Stat. It of course is possible that the Attorney General could suspect a violation of the antitrust laws, but have no reason to believe there has been a DUTPA violation, and vice versa. The fact that the Attorney General issued antitrust CIDs in the case at bar thus does not mean he also had grounds for issuance of DUTPA subpoenas.

22. CIDs may include written interrogatories, *see* § 542.28(1)(b), while there is no provision for written interrogatories in DUTPA subpoenas. The CIDs at issue in the case at bar include written interrogatories; these apparently would not be appropriate in a DUTPA subpoena.

23. *Compare* § 542.28(5), Fla. Stat. (antitrust CIDs) *with* § 501.206(1), Fla. Stat. (DUTPA subpoenas). The CIDs at issue explicitly advise the recipients of the procedures applicable to antitrust CIDs. They do not advise the recipients of the distinct procedures applicable to DUTPA subpoenas.

24. *Compare* § 542.28(9), Fla. Stat., *with* § 501.2065, Fla. Stat.

25. As a matter of state law, the Attorney General may or may not have authority to issue subpoenas under DUTPA to investigate the possible contraction of Major League Baseball. What is clear, however, is that he has not done so. Whether he properly could do so is not an issue now before this court.

Florida Statutes, as part of an antitrust investigation. The Florida Supreme Court held that the long recognized exemption of the business of baseball applied only to the reserve clause, so that the proposed sale and relocation of a franchise were not exempt.

■■ *Butterworth* does not foreclose a correct application of the antitrust exemption in the case at bar. Under Florida law, the doctrine of collateral estoppel "may be asserted only when the *identical issue* has been litigated *between the same parties or their privies.*" *Stogniew v. McQueen*, 656 So.2d 917, 919 (Fla.1995) (emphasis added), *quoting Trucking Employees of North Jersey Welfare Fund, Inc. v. Romano*, 450 So.2d 843, 845 (Fla. 1984). Further, the identical issue must not only be raised but "actually adjudicated." *Burshan v. National Union Fire Insurance Company of Pittsburgh, PA.*, 2001 WL 883234, *8 (Fla. 4th DCA 2001) ("the judgment in the first suit only estops the parties from litigating in the second suit issues which were actually adjudicated in the prior litigation"), *citing Shearson Hayden Stone, Inc. v. Seymour*, 356 So.2d 834, 836 (Fla. 1st DCA 1978).

■ In the case at bar the Attorney General fails the "same parties or their privies" test, with respect to at least some of the plaintiffs, and also fails both the "identical issue" and "actually adjudicated" tests.

First, none of the plaintiffs in the case at bar-Major League Baseball, Commissioner Allen H. Selig in his official and individual capacities, Florida Marlins Baseball Club, L.L.C., and Tampa Bay Devil Rays, Ltd.- was a party in *Butterworth*. The National League was a party, but that is a different entity from Major League Baseball, which was not a party to and had no right to litigate its interests in *Butterworth*. Mr. Selig also was not a party, even in his official capacity, but even more clearly Mr. Selig was not a party in his individual capacity. The Florida Marlins were a club in the National League, but this record apparently does not indicate whether the Marlins were owned at that time by the current owner, plaintiff Florida Marlins Baseball Club, L.L.C.[26] And even if it could be said that Major League Baseball, its Commissioner and the Marlins were in privity with the National League, the same could not be said of the Tampa Bay Devil Rays, a club that was not even in existence at that time and that now is a member only of the American League, not the National.

■ This lack of identity of parties is not a trivial matter. Florida has adhered to the requirement of mutuality as a condition of the application of the doctrine of collateral estoppel as fiercely as any state in the nation. *See E.C. v. Katz*, 731 So.2d 1268 (Fla.1999); *Stogniew v. McQueen*, 656 So.2d 917 (Fla.1995). And even being directly involved in the litigation of the earlier case, on the same side of the issue, does not necessarily establish privity; the test is whether the person against whom collateral estoppel is asserted had "an interest in the [prior] action such that she will be bound by the final judgment as if she were a party." *Gentile v. Bauder*, 718 So.2d 781, 783 (Fla.1998) (holding police officer not bound by ruling in criminal prosecution that search warrant obtained by officer was invalid). Aside from any precedential effect, the Florida Supreme Court's decision in *Butterworth* was binding on the National League, but it would

---

**26.** Because collateral estoppel is an affirmative defense, the burden of proof is on the Attorney General, as the defendant, requiring that an issue on which there is no proof be resolved in favor of plaintiffs.

not have been binding on Major League Baseball, its Commissioner, or the then-owner of the Marlins, let alone on Mr. Selig individually or the non-existent Devil Rays.[27]

More significantly, the issue in *Butterworth* was not the same as in the case at bar. The Florida Supreme Court went to great length in *Butterworth* to assert that the antitrust exemption is not a one-size-fits-all concept; instead, according to that court, cases applying the exemption to the reserve clause (*Federal Baseball, Toolson* and *Flood*) are applicable only to the reserve clause, leaving open the issue of the applicability of the exemption to other areas. Based on this reasoning, the court held that *Federal Baseball, Toolson* and *Flood* did not indicate the antitrust exemption applied to a proposed sale and relocation of a franchise, as involved in *Butterworth*.

There is substantial irony in the Attorney General's assertion now that *Butterworth*-a decision in which the Florida Supreme Court accepted the Attorney General's assertion that the antitrust exemption must be evaluated issue by issue-forecloses consideration of whether the antitrust exemption applies to yet another issue, the proposed contraction from 30 clubs to 28. By its own terms, the Florida Supreme Court's analysis did not decide the issue in the case at bar.

Thus the "identical issue" involved in *Butterworth*—applicability of the antitrust laws to the 1994 proposed sale and transfer of the Giants to Florida-is not involved here, and the issue in the case at bar-the applicability of the antitrust laws to the 2002 proposed contraction of the major leagues—was not involved in, nor "actually adjudicated" in, *Butterworth*. The doctrine of collateral estoppel does not bar this action.

If, as I have concluded, *Federal Baseball, Toolson* and *Flood* hold that the business of baseball is exempt from the antitrust laws, then the Attorney General cannot apply the antitrust laws to Major League Baseball's proposed contraction. If, on the other hand, the Florida Supreme Court was correct in *Butterworth* that the antitrust exemption must be evaluated issue by issue, then surely its decision there did not decide the separate issue of whether the antitrust laws apply to the proposed contraction. On either view, the issue of the applicability of the antitrust laws to the proposed contraction is ripe for resolution in this court and is not foreclosed by *Butterworth*. The Attorney General simply cannot have it both ways, asserting that *Federal Baseball, Toolson* and *Flood* should be confined to their facts but that *Butterworth* should not. The doctrine of collateral estoppel does not bar this action.

---

**27.** As confirmation of this, consider the possibility that, after issuance of the 1994 CID to the National League, a state circuit court in Tampa had addressed not the antitrust exemption issue, but the issue of whether, as a factual matter, a specific interrogatory included in the CIDs was outside the scope of the investigation authorized by state law or was overly burdensome. If the Tampa court resolved this issue in the Attorney General's favor, and the Attorney General then issued a new CID to the Marlins, would the Marlins be estopped from challenging the CID on the same grounds in a Miami circuit court? Under Florida law, the answer is no. The Marlins, like the police officer in *Gentile*, would be entitled to their own day in court. Even more clearly, Mr. Selig individually, or the later-created American League Devil Rays, would be so entitled. In short, *Butterworth's* ability to command acceptance in later cases involving other CIDs and other parties stems not from its binding collateral estoppel effect but from its precedential value, which, for the reasons set forth earlier in this opinion, is insufficient to carry the day, given the contrary decisions of the United States Supreme Court and the Eleventh Circuit.

## VI

### Rooker–Feldman

 Finally, the Attorney General asserts this action is barred by the principle that federal district courts have no jurisdiction over cases that are, in effect, appeals of state court judgments. Under the "*Rooker–Feldman* doctrine," an unsuccessful state court litigant cannot properly challenge a state court judgment by a separate action in federal court. *See, e.g., Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923); *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). The Attorney General says the case at bar is in effect an appeal of the Florida Supreme Court's *Butterworth* decision.

 Not so. The case at bar is a challenge to CIDs issued by the Attorney General in 2001. Those CIDs were not involved in *Butterworth. Butterworth* involved different CIDs directed to different parties as part of an investigation of a different proposed transaction. After the court's decision, those CIDs apparently were complied with; in any event, they are not at issue here.

The *Rooker–Feldman* doctrine is not implicated just because, in a federal lawsuit, a party takes issue with the precedential value of a state court judgment. That is all that has happened here. *Rooker–Feldman* does not bar this action.

## VII

### Remaining Issues

 For purposes of plaintiffs' motion for a preliminary injunction, the record is closed, and what has been said establishes that plaintiffs are likely (indeed, virtually certain) to prevail on the merits. Plaintiffs also meet the other criteria for issuance of a preliminary injunction.[28] A preliminary injunction therefore has been separately entered and will remain in effect in accordance with its terms.

In accordance with the procedure announced at the preliminary injunction hearing, with the Attorney General's consent, he will be given an opportunity to request further proceedings on the merits, prior to entry of a final judgment. Alternatively, the Attorney General may agree to entry of a final judgment, in light of (but without acquiescing in) the court's opinion. If the Attorney General requests further proceedings on the merits, he may also request that plaintiffs be required to post security.

If the Attorney General agrees to entry of a final judgment, he will be deemed to have preserved all positions and objections taken in this litigation to date, including the assertion that applying the antitrust exemption to the proposed contraction of Major League Baseball cannot be done as a matter of law but instead requires a factual record. The Attorney General will be deemed to have waived, however, any assertion that he has been given insufficient time, or that the procedures followed in this court otherwise were insufficient,

**28.** In *Teper v. Miller,* 82 F.3d 989, 992 n. 3 (11th Cir.1996), the Eleventh Circuit said:

In order to warrant the grant of a preliminary injunction, a plaintiff has the burden of proving four factors: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction were not granted; (3) that the

threatened injury to the plaintiff outweighs the harm an injunction may cause the defendant; and (4) that granting the injunction would not disserve the public interest. *See also Canal Authority v. Callaway,* 489 F.2d 567, 572 (5th Cir.1974). I find these criteria satisfied here.

for full and fair presentation of the strictly legal issues that have been addressed in this opinion, including the issue of whether, as a matter of law and without the need for a factual record, the proposed contraction is exempt from the federal and state antitrust laws.

Accordingly,

IT IS ORDERED:

1. The preliminary injunction entered December 21, 2001 (document 27) remains in effect in accordance with its terms.

2. The Attorney General shall file by January 10, 2002, a statement of whether he seeks further proceedings in this court or agrees to entry of a final judgment.